DREW KONING (263082) (drew@kzllp.com)
BLAKE ZOLLAR (268913) (blake@kzllp.com)
SHAUN PAISLEY (244377) (shaun@kzllp.com)

**KONING ZOLLAR LLP**
2210 Encinitas Blvd. STE S
Encinitas, CA 92024
Telephone:   (858) 252-3235
Facsimile:    (858) 252-3238

Attorneys for Plaintiff
GLOBAL VENTU HOLDING B.V.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLOBAL VENTU HOLDING B.V., <br><br> Plaintiff, <br><br> v. <br><br> ZEETOGROUP, LLC, SAMPLES.COM, LLC, and TIBRIO, LLC, <br><br> Defendants. | Case No.: **'19CV1018 DMS LL** <br><br> **COMPLAINT FOR:** <br><br> **(1) Breach of Revenue Share Agreement** <br><br> **(2) Breach of Publisher Services Agreement** <br><br> **(3) Violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq.*)** <br><br> **(4) Violation of Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*)** <br><br> **(5) Unfair Competition (Cal. Bus. & Prof. Code § 17200 *et seq.*)** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff states and alleges as follows:

## **PARTIES**

1.    Plaintiff Global Ventu Holding B.V. ("Plaintiff" or "Global Ventu") is a Dutch corporation, with its principal place of business located at Sint Sebastiaansbrug 13 2611DN, Delft, The Netherlands.  Global Ventu is a target driven advertising agency specializing in lead generation and data acquisition, *i.e.*, the generation of consumer interest into a business's products or services.

2.    Defendant Samples.com, LLC ("Samples") is a Delaware limited liability company with its principal place of business in San Diego, California.  While LLC membership information for Samples is not publicly available, Plaintiff alleges on information and belief that Samples is a citizen of a State within the United States. *See Carolina Casualty Insurance Co. v. Team Equipment, Inc.*, 741 F.3d 1082 (9th Cir. 2014).  Samples operates www.samples.com and www.getitfree.us, websites that connect users with samples, coupons, and deals available on the internet.

3.    Defendant Tibrio, LLC ("Tibrio") is a Delaware limited liability company with its principal place of business in New York City, New York.  While LLC membership information for Tibrio is not publicly available, Plaintiff alleges on information and belief that Tibrio is a citizen of a State within the United States.  In July 2018, Tibrio announced that Samples had "rebranded" as Tibrio.  Given that announcement, Global Ventu alleges on information and belief that Tibrio has succeeded to Samples' contractual and other legal obligations and seeks to impose liability on Tibrio on that basis.

4.    Defendant ZeetoGroup, LLC ("ZeetoGroup") is a Delaware limited liability company with its principal place of business in San Diego, California.  While LLC membership information for ZeetoGroup is not publicly available, Plaintiff alleges on information and belief that ZeetoGroup is a citizen of a State within the United States.  Global Ventu also alleges on information and belief that ZeetoGroup owns and controls Samples and is functionally the parent company of Samples.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as to Plaintiff's trade secret claim under 18 U.S.C. § 1836.  This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2).  The amount in controversy exceeds $75,000 exclusive of interest and costs, and this action is brought by a plaintiff who is a citizen of a foreign state against defendants who are all citizens of a State in the United States.

6.      Venue is proper in the Southern District of California under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Global Ventu's claims occurred in this district and the Defendants' principal place of business is located in this district.

7.      This district is also the proper venue because both the September 12, 2016 Publisher Services Agreement and the September 17, 2016 Revenue Share Agreement between Global Ventu and Samples expressly provide for jurisdiction and venue in San Diego County, California.  The Publisher Services Agreement ("PSA") is attached hereto as Exhibit A and is incorporated by reference.  The Revenue Share Agreement ("RSA") is attached hereto as Exhibit B and is incorporated by reference.

## FACTUAL BACKGROUND

8.      In June 2016, Global Ventu entered into a business relationship with Samples, a company that connects users with samples, coupons, and deals available on the internet.  Under the parties' initial business arrangement, Global Ventu was to use its expertise in Internet marketing and advertising, and in media buying and social media, to drive visitors to www.getitfree.us, and would receive as consideration a fixed commission for each user registration.

9.      In September 2016, Samples and Global Ventu decided to memorialize their business relationship, as well as change the structure under which Samples would compensate Global Ventu for its work.  The parties entered into two agreements.  First, on September 12, 2016, they entered into the PSA, which

contained terms governing the parties' relationship in connection with the advertising and marketing services Global Ventu provided to Samples.  Recognizing that they may disclose confidential and proprietary information to one another during the course of their business relationship, the parties included a provision in the PSA addressing the use of "Confidential Information," which was defined as "all data and information, of a confidential nature or otherwise, disclosed during the term of the Agreement by one party ('Disclosing Party') to the other party ('Receiving Party'), as well as information that the Receiving Party knows or should know that the Disclosing Party regards as confidential." Ex. A § 9.  Under the PSA, the Receiving Party agreed that it "will not, for any reason or under any circumstance, directly or indirectly use, convert, apply, appropriate, employ, alter, transform, assign, put into operation or otherwise use any Confidential Information, in whole or in part[], for any purpose whatsoever, other than as expressly permitted herein." *Id.*

10.    Second, on September 17, 2016, Samples and Global Ventu also entered into the RSA.  The RSA provided further detail about the "Services" that Global Ventu would provide to Samples, stating that Samples would provide Global Ventu with access to Samples' social media accounts, specifically its "Facebook Account," and that Global Ventu would then "be responsible for general oversight and management of the Facebook Account, which includes, but is not limited to:  (1) developing and optimizing existing campaigns; (2) managing budgets for campaigns; and (3) planning, buying, and executing campaigns." Ex. B § 1.

11.    The RSA provided that each party would retain its own rights in any intellectual property it created, stating that "[s]hould either Samples or Global Ventu create any advertisements, creatives, copy, or any other related intellectual property, the new creations will remain the property of the party which created such intellectual property." Ex. B § 2.

12.    The RSA also set out a revised compensation structure, entitling Global Ventu to a revenue share percentage based upon Samples' earnings that were directly

attributable to Global Ventu's oversight and management of the Facebook Account, with Global Ventu receiving 84% of revenue derived from the Facebook Account, and Samples retaining the other 16%.  Ex. B § 4.

13.    The RSA's termination provision provided that, unless a party materially breached the RSA (in which case the non-breaching party could terminate the agreement with immediate effect), a party wishing to terminate the RSA must provide the other party with "two (2) business days prior written notice."   The agreement further provided that "[u]pon termination, Global Ventu's access to the Facebook Account shall be withdrawn."  Ex. B § 5.

14.    In the ensuing two-plus years, Global Ventu performed all of its obligations under the parties' agreements and, in doing so, provided significant value to Samples.  As contemplated by Section 1 of the RSA, Global Ventu oversaw and managed the Samples Facebook Account, which was owned by ZeetoGroup (Samples' parent company).   Global Ventu created its own advertising content, including text, images and videos, which was posted on that Facebook Account.  And by use of tracking pixels (website code that tracks a user's behavior) embedded in the advertisements, Global Ventu was able to build a profile of the audience of users that responded well to its Facebook ad campaigns, and use that data to optimize the targeting of its ads.   Global Ventu's original ad content, combined with the confidential audience targeting data it built up using proprietary methods, generated more than $10 million in revenue over the course of two years.

15.    While the Facebook Account Global Ventu managed belonged to ZeetoGroup, the parties recognized that the account contained Global Ventu's Confidential Information and worked to ensure that safeguards were in place to strictly limit access to the Facebook Account.  Accordingly, while Samples—in addition to contracting with Global Ventu to drive Facebook traffic—had an in-house Facebook media buying team, that internal team did not have authority to access the Facebook Account managed by Global Ventu.

16.    In October 2018, the then-CEO of Samples, Josh Ogle, left the company, and was replaced by an interim CEO, Stephan Goss, who was also CEO of ZeetoGroup.  On November 12, 2018, Samples informed Global Ventu that it was switching its backend technology to a software called ZAN, which had been developed by ZeetoGroup.  Based on testing performed over the course of several months, ZeetoGroup's software performed far worse than the software the parties had been using, and this transition would have resulted in a significant drop in revenue for Global Ventu.  Indeed, a Samples representative acknowledged to Global Ventu that the performance of the ZeetoGroup software was "shitty."

17.    As a result, Global Ventu sought to negotiate an increased revenue share until such time as problems with the software were worked out.  During the parties' November 16, 2018 discussions, Samples threatened that if Global Ventu did not accept its offer, Samples would end the relationship and "take this in house."  Global Ventu reminded Samples in response to this threat that the traffic "runs through [Global Ventu's] voluum links"—referring to Voluum, a tracking software—and that, under the RSA, Global Ventu retained intellectual property rights over all of its ads and content.  Samples stated in response that it understood.

18.    Later that day, when Global Ventu declined what Samples said was its best and final offer of a renegotiated revenue share, Samples and ZeetoGroup responded by immediately revoking Global Ventu's access to the Facebook Account. While the RSA provided for the withdrawal of access to the Facebook Account "[u]pon termination," the RSA had not yet been terminated, and Samples had yet to even provide the contractually required two-business-days' notice.  As a result of this improper lock-out, which violated the plain terms of the September 17, 2016 RSA, Global Ventu was unable to access and remove all of the ad content and proprietary tracking information it had spent years and significant sums of money developing.

19.    On Monday, November 19, 2018, Samples sent Global Ventu a letter belatedly purporting to provide the "required two business days prior written notice

of its intent to terminate the Agreement" and to inform Global Ventu that, as of November 21, 2018, its "access to the Facebook Account will be terminated." The letter did not acknowledge that Samples and ZeetoGroup had, in violation of the RSA, already terminated Global Ventu's access to the Facebook Account days earlier.

20.    By immediately terminating Global Ventu's access to the Facebook Account in violation of the RSA, and thereby ensuring that Global Ventu could not remove its ad content or the confidential ad-targeting data, Samples and ZeetoGroup now had access to Global Ventu's valuable content and information.

21.    Samples and ZeetoGroup proceeded to use that content and information for their own profit. Beginning just days after improperly terminating the RSA and locking Global Ventu out of the Facebook Account, Samples and ZeetoGroup starting running Facebook ads with identical or near-identical content to those created by Global Ventu.

22.    In addition, upon information and belief, Samples and ZeetoGroup also began using the confidential ad targeting data developed by Global Ventu, which Samples and ZeetoGroup had been able to obtain by improperly locking Global Ventu out of the Facebook Account it had managed for more than two years.

23.    In the several months following termination of the parties' relationship, Samples and ZeetoGroup have used Global Ventu's ad content and trade secret information to generate revenues of at least hundreds of thousands of dollars, at a rate of up to $17,500 per day.

24.    In sum, rather than continuing the agreements and having to pay Global Ventu a share of the revenue it generated, Samples and ZeetoGroup found a more profitable path: they simply cut Global Ventu out of the picture by stealing and using Global Ventu's intellectual property and confidential information, and then kept all of the resulting revenue for themselves. Because the path Samples and ZeetoGroup chose violates both the parties' contracts and federal and California law, Global

Ventu now seeks relief from this Court.

## FIRST CLAIM FOR RELIEF

### Breach of September 17, 2016 Revenue Share Agreement

### (Against Defendants Samples and Tibrio)

25.    Global Ventu incorporates by reference the allegations set forth in paragraphs 1 through 24, above, as if set forth fully herein.

26.    Global Ventu and Samples entered into a valid contract, the Revenue Share Agreement, dated September 17, 2016.

27.    Global Ventu has performed all of its obligations under the RSA.

28.    In the RSA, Samples agreed that each party would retain its own rights in any intellectual property it created, and that "[s]hould either Samples or Global Ventu create any advertisements, creatives, copy, or any other related intellectual property, the new creations will remain the property of the party which created such intellectual property."  Ex. B § 2.

29.    In the RSA, Samples further agreed to provide Global Ventu with access to the Facebook Account, and that it would withdraw that access only upon termination of the RSA.  Without validly terminating the RSA, however, Samples revoked Global Ventu's access to the Facebook Account, thus depriving Global Ventu of access to its own ad content (which Samples had agreed was Global Ventu's intellectual property) and confidential information, which Global Ventu had the right to remove prior to termination.

30.    As a proximate result of the Defendants' acts as alleged above, Global Ventu has suffered actual damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Breach of September 12, 2016 Publisher Services Agreement

### (Against Defendants Samples and Tibrio)

31.    Global Ventu incorporates by reference the allegations set forth in paragraphs 1 through 30 above, as if set forth fully herein.

32.    Global Ventu and Samples entered into a valid contract, the Publisher Services Agreement, dated September 12, 2019.

33.    Global Ventu has performed all of its obligations under the PSA.

34.    In the PSA, Samples agreed that it "will not, for any reason or under any circumstance, directly or indirectly use, convert, apply, appropriate, employ, alter, transform, assign, put into operation or otherwise use any Confidential Information, in whole or in part[], for any purpose whatsoever, other than as expressly permitted herein." *Id.*  In violation of that provision, Samples has used, converted, applied, appropriated, employed, and put into operation Global Ventu's confidential ad targeting data, which Samples improperly obtained when it revoked Global Ventu's access to the Facebook Account.

35.    As a proximate result of the Defendants' acts as alleged above, Global Ventu has suffered actual damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**

**Violation of the California Uniform Trade Secrets Act (CUTSA)**

**Cal. Civ. Code § 3426 *et seq.***

**(Against All Defendants)**

36.    Global Ventu incorporates by reference the allegations set forth in paragraphs 1 through 35 above, as if set forth fully herein.

37.    Global Ventu expended considerable time, effort, and expense over the course of two years in developing trade secret information concerning the profile of users that responded well to its ad campaigns, which data could then be used to optimize the targeting of its ads.

38.    The information Global Ventu developed derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

39.    Global Ventu undertook reasonable efforts under the circumstances to maintain the secrecy of this information, including by entering into a written

agreement with Samples that prohibited Samples from using its Confidential Information for any purpose whatsoever. Global Ventu also had an understanding with Samples that access to the Facebook Account managed by Global Ventu would be strictly limited, and that Samples' internal team responsible for Facebook advertising would not have access to the Facebook Account in order to safeguard the confidential information.

40. Samples and ZeetoGroup used improper means to acquire knowledge of Global Ventu's trade secret information, including by breaching the parties' express confidentiality agreement in the PSA, and by improperly locking Global Ventu out of the Facebook Account it was responsible for managing in violation of the RSA, in order to prevent Global Ventu from removing the information. Samples and ZeetoGroup then used that improperly acquired trade secret information to generate revenue for themselves after terminating the relationship with Global Ventu.

41. As a result of Defendants' misappropriation of Global Ventu's trade secrets, Global Ventu has suffered actual loss, and Defendants have been unjustly enriched, in an amount to be determined at trial. Moreover, because Defendants' misappropriation was willful and malicious, Global Ventu seeks an award of exemplary damages.

## **FOURTH CLAIM FOR RELIEF**

### **Violation of Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.***

### **(Against All Defendants)**

42. Global Ventu incorporates by reference the allegations set forth in paragraphs 1 through 41, above, as if set forth fully herein.

43. Global Ventu expended considerable time, effort, and expense over the course of two years in developing trade secret information concerning the audience profile of users that responded well to its ad campaigns, which data could then be used to optimize the targeting of its ads.

44. The information Global Ventu developed derives independent economic

1    value from not being generally known to the public or to other persons who can

2    obtain economic value from its disclosure or use.

3        45.    The information Global Ventu developed is used for the purpose of

4    targeting advertising to consumers in internet commerce, and the trade secret

5    information is therefore used in interstate and foreign commerce.

6        46.    Global Ventu undertook reasonable efforts under the circumstances to

7    maintain the secrecy of this information, including by entering into a written

8    agreement with Samples that prohibited Samples from using its Confidential

9    Information for any purpose whatsoever.  Global Ventu also had an understanding

10   with Samples that access to the Facebook Account managed by Global Ventu would

11   be strictly limited, and that Samples' internal team responsible for Facebook

12   advertising would not have access to the Facebook Account in order to safeguard the

13   confidential information.

14       47.    Samples and ZeetoGroup used improper means to acquire knowledge of

15   Global Ventu's trade secret information, including by breaching the parties' express

16   confidentiality agreement in the PSA, and by improperly locking Global Ventu out

17   of the Facebook Account it was responsible for managing in violation of the RSA, in

18   order to prevent Global Ventu's ability to remove the information.  Samples and

19   ZeetoGroup then used that improperly acquired trade secret information to generate

20   revenue for themselves after terminating the relationship with Global Ventu.

21       48.    As a result of Defendants' misappropriation of Global Ventu's trade

22   secrets, Global Ventu has suffered actual loss, and Defendants have been unjustly

23   enriched, in an amount to be determined at trial.  Moreover, because Defendants'

24   misappropriation was willful and malicious, Global Ventu seeks an award of

25   exemplary damages.

26               **FIFTH CLAIM FOR RELIEF**

27   **Unfair Competition under Cal. Bus. & Prof. Code § 17200 _et seq._**

28               **(Against All Defendants)**

49.    Global Ventu incorporates by reference the allegations set forth in paragraphs 1 through 48, above, as if set forth fully herein.

50.    Defendants' conduct as described herein amounts to an "unfair … business act or practice."    Samples violated the RSA by, in coordination with ZeetoGroup, revoking Global Ventu's access to the Facebook Account without having terminated that agreement, thus ensuring that Global Ventu could not reclaim its confidential information.    Defendants then proceeded to steal Global Ventu's confidential information, and then use that confidential information for Defendants' own profit.    That conduct is unethical, oppressive, and unscrupulous.

51.    Global Ventu has suffered injury in fact and lost money and property as a result of Samples' unfair conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment awarding them the following relief against Defendants:

**1.**    Damages in an amount to be determined at trial;

**2.**    Exemplary damages under CUTSA and DTSA;

**3.**    Restitution of money or property unlawfully acquired by Defendants;

**4.**    An injunction restraining Defendants' continuing use of Plaintiff's trade secret information, breaches of contract, and unfair business practices;

**5.**    Attorneys' fees and costs; and

**6.**    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues so triable.

1     Dated:  May 30, 2019                    KONING ZOLLAR LLP

2

3                                            */s/ Drew Koning*

4

5                                            DREW KONING (263082)
6                                            (drew@kzllp.com)
                                             BLAKE ZOLLAR (268913)
7                                            (blake@kzllp.com)
                                             SHAUN PAISLEY (244377)
8                                            (shaun@kzllp.com)
9

10

11                                           Attorneys for Plaintiff
                                             GLOBAL VENTU HOLDING B.V.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**PUBLISHER SERVICES AGREEMENT**

This Publisher Services Agreement ("Agreement") entered into on ___9/12/2016___ ("Effective Date"), as well as any Insertion Orders ("IO") subsequently entered into, shall govern the relationship between Samples.com, LLC ("Advertiser" or "Samples.com"), a Delaware limited liability company located at 925 B Street, Fifth Floor, San Diego, CA 92101, and ___Global Ventu Holding BV___, ("Publisher"), a ___Netherlands Corporation___ having primary offices at ___Sint Sebastiaansbrug 13, 2611DN Delft, The Netherlands___ in connection with the advertising and marketing services provided to Advertiser by Publisher. If not otherwise defined, the terms used herein shall have the meaning specified in the Agreement.

1.  <u>Services</u>.  In connection with the advertising and marketing services ("Services"), Publisher may undertake campaigns for Advertiser (each a "Campaign"), whereby Publisher may distribute Advertiser's proprietary materials including, but not limited to, online display ads, graphic files, and similar media ("Advertising Material").  Publisher will only distribute Advertising Material internally and shall not distribute or re-sell Advertising Material to any external third party without Advertiser's written consent.  In connection with such Campaigns, Advertiser shall pay Publisher for compensable transactions generated on behalf of Advertiser as set forth in the applicable IO.

2.  <u>Advertising Material</u>.  Advertiser shall provide Publisher with all applicable Advertising Material prior to the beginning of a Campaign.  Advertiser grants to Publisher a non-exclusive, transferable, revocable, sub-licensable right and license to use, reproduce, display, transmit, and distribute the Advertising Material for the purposes of performance of this Agreement.  Publisher shall not alter, cut, crop, resize, modify, or make any other material change to the Advertising Material for any Campaign without Advertiser's prior consent.  Nothing contained within this Agreement grants Publisher any intellectual property or ownership right to the Advertising Material, and Publisher may not copy, reproduce or create derivative works of the Advertising Material for any purpose outside of this Agreement without Advertiser's prior consent.

3.  <u>Affiliates</u>.  Publisher shall not use Affiliates or Sub-Affiliates without Advertiser's prior written consent.  If Advertiser consents, and Publisher uses Affiliates, or Sub-Affiliates, Publisher represents that it will bind such Affiliates and sub-Affiliates to the terms of this Agreement and shall be liable for any breach of this Agreement by such Affiliates and Sub-Affiliates.

4.  <u>Payment</u>.  Publisher shall invoice Advertiser monthly, and unless otherwise set forth in the applicable IO, payment will be due to Publisher within thirty (30) days of the end of the month.  Advertiser shall have ten (10) business days from its receipt of an invoice to notify Publisher of any dispute relating to such invoice.

5.  <u>General.</u>  Any web sites, emails, advertisements, links, or other media properties used to promote, display or transmit the Advertiser's Program shall meet the following requirements:

     (a) not include content that is deceptive or misleading or otherwise fails to comply with applicable federal and state consumer protection laws;

     (b) not infringe upon the personal rights, trademark, trade name, logo, publicity right, copyright, or other intellectual property (collectively, "Marks") of any third party;



(c) not contain content that is an invasion of privacy, degrading, libelous, unlawful, deceptive, profane, obscene, pornographic, tends to ridicule or embarrass, or is in bad taste, at the sole discretion of Advertiser;

(d) not offer incentives, points, rewards, cash, or prizes to consumers in return for their response to the advertisement;

(e) not spawn malicious, false, or deceptive pop-ups or exit pop-ups;

(f) not serve advertisements, or drive traffic to advertisements, using any spyware or similar downloadable application;

(g) not use any methods to generate Leads or Sales that are not initiated by the affirmative action of a consumer;

(h) not constitute any advertising via facsimile or telemarketing (including, without limitation, by use of prerecorded or artificial voice messages);

(i) not constitute any advertising to wireless devices or portable electronic devices by text messaging in any form (including without limitation SMS, Smart Messaging, EMS, and MMS);

(j) not promote any illegal activity including without limitation the promotion of gambling, illegal substances, software piracy, or hacking;

(k) not spoof, or redirect, traffic to or from any adult-oriented web sites or any other web sites not specifically designated by Advertiser as a Landing Page.

6. <u>Fraud</u>. Advertiser reserves the right to terminate this Agreement and investigate Publisher for fraudulent activity at its sole discretion. "Fraudulent Activity" for the purposes of this Agreement includes, but is not limited to, the following: if Advertiser suspects or determines that Publisher (a) generates multiple leads from the same IP address; (b) places Advertiser's links on incentivized websites without Advertiser's prior written consent; (c) generates multiple leads using proxy servers; (d) generates traffic in a manner other than as set forth in the applicable Campaign; or (e) uses fake redirects, automated software, or fraud to generate clicks or leads from Advertiser's campaign. The foregoing merely constitutes examples of fraudulent activity and shall not constitute a comprehensive list of all possible fraudulent activity.

(a) [Deleted]

(b) Advertiser shall provide to Publisher within ten (10) business days from the date of invoice, notice of Fraudulent Activity and a written report, including the reason and details of Fraudulent Activity. Publisher shall have five (5) business days from the receipt of the notice to respond, in which Publisher and Advertiser shall work together in good faith to mutually determine the correct amount of payment owed to Publisher.



7.  <u>Privacy Policy.</u> If Publisher uses a web site to promote Advertiser's Program, it must include a clear and conspicuous privacy policy that complies with the requirements of Cal. Bus. & Prof. Code § 22575-22579 (a California statute) and specifically states that consumer information collected through the site will be shared with third parties for marketing, fulfillment, or any other purposes.

8.  <u>Audit Rights.</u> In the event that Advertiser has a reasonable belief that Publisher, or its Affiliate or Sub-Affiliate, is not acting in compliance with this Agreement, or to the extent required by applicable law or any regulatory authority, Advertiser may audit and examine Publisher's activities and operations related to the obligations of Publisher hereunder.

9.  <u>Confidential Information.</u> For purposes of this Agreement, "Confidential Information" shall mean all data and information, of a confidential nature or otherwise, disclosed during the term of the Agreement by one party ("Disclosing Party") to the other party ("Receiving Party"), as well as information that the Receiving Party knows or should know that the Disclosing Party regards as confidential. Confidential information does not include information that: (i) is in or enters the public domain without breach of this Agreement; (ii) the Receiving Party lawfully knew prior to receiving such information from the Disclosing Party; or (iii) the Receiving Party develops independently without the use of Disclosing Party's Confidential Information. The Receiving Party agrees that it: (i) will not, for any reason or under any circumstance, directly or indirectly use, convert, apply, appropriate, employ, alter, transform, assign, put into operation or otherwise use any Confidential Information, in whole or in party, for any purpose whatsoever, other than as expressly permitted herein; (ii) will not disclose to any third party Confidential Information except as expressly permitted in this Agreement or as otherwise necessary to perform its obligations or exercise its rights under this Agreement; and (iii) will take all reasonable measures to maintain the confidentiality of the Confidential Information in its possession or control. Notwithstanding the foregoing, either party may disclose Confidential Information as necessary to comply with the requirements of legal or administrative processes, provided that such Party provides the other Party with reasonable advance notice of any such intended disclosure and cooperates reasonably with its efforts to obtain a protective order.

10. <u>Non-Compete.</u> [Deleted]

11. <u>Representations and Warranties.</u> Each party represents and warrants that: (i) it has the power and authority to enter into and perform its obligations under this Agreement; and (ii) at all times, the Advertising Material (and its transmission) and its performance hereunder shall comply with all applicable laws, rules, regulations, and ordinances (collectively, "Laws") and will not violate any applicable rights of any third party. Furthermore, Publisher represents and warrants that it has disclosed, prior to executing this Agreement, the existence of any federal or state decrees, orders, or consent agreements, and any pending formal or informal government investigations or prosecutions by the Federal Trade Commission, any other federal or state governmental or regulatory body or agency, or any industry regulatory authority.

12. <u>Indemnity.</u> Each party (the "Indemnifying Party") agrees to indemnify, defend, and hold the other party and its directors, officers, employees, and agents (the "Indemnified Party") harmless from and against any and all actions, claims, demands, proceedings, liabilities, judgments, settlements, fines, penalties, costs and expenses, including attorneys' fees and



related costs (collectively, "Losses") which: (i) arise solely or in part from the act(s) and/or omission(s) of the Indemnifying Party; or (ii) arise from or are related to a breach by the Indemnifying Party of any express warranty herein. The Indemnified Party will promptly notify the Indemnifying Party of any such claim it becomes aware and will provide reasonable cooperation to the Indemnifying Party at the Indemnifying Party's expense in connection with the defense or settlement of any such claim and be entitled to participate at is own expense in the defense of any such claim.

13.   <u>Disclaimer/Limitation of Liability</u>.   TO THE EXTENT PERMISSIBLE BY LAW, NEITHER PARTY MAKES ANY EXPRESS OR IMPLIED WARRANTY, TO THE EXTENT PERMISSIBLE BY LAW, OTHER THAN THE WARRANTIES EXPRESSED IN THIS AGREEMENT, IF ANY. EACH PARTY PROVIDES THE SERVICES UNDER THIS AGREEMENT ON AN "AS IS" BASIS, AND HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED (EXCEPT THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT), REGARDING THE PARTY'S SERVICES OR ANY PROTION THEREOF, INCLUDING BUT NOT LIMITED TO ANY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT OR DIRECT LOST PROFITS, OR OTHER INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES, EVEN IF SUCH PARTY WAS OR SHOULD HAVE BEEN AWARE OR WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, OTHER THAN FOR PAYMENT OBLIGATIONS, EACH PARTY'S TOTAL CUMULATIVE LIABILITY HEREUNDER, FROM ALL CAUSES OF ACTION OF ANY KIND, SHALL BE LIMITED TO THE AMOUNTS PAID TO PUBLISHER BY ADVERTISER DURING THE SIX (6) MONTHS PRIOR TO THE DATE THE CAUSE OF ACTION AROSE.

14.   <u>Termination</u>.  Either party may terminate this Agreement by providing the other party with two (2) business days prior written notice. Upon termination of this Agreement, any license granted under this Agreement shall be revoked, and Publisher shall immediately remove and discontinue the use of any Samples.com Advertising Material and cease conducting Advertising Campaigns on behalf of Advertiser. Any provisions of this Agreement that may reasonably be expected to survive termination or expiration of the Agreement shall survive and remain in effect in accordance with their terms.

15.   <u>Miscellaneous.</u>

   **(a) Failure to Comply.**  Without limiting any other remedies specified herein or otherwise available to Advertiser, Publisher's failure to comply with the requirements of this Agreement will result in non-payment for the entire Program and may result in termination of Publisher's eligibility to promote Advertiser's Programs, at Advertiser' sole discretion.

   **(b) Notices.**  Any notices hereunder shall be given to the appropriate party at the address specified above or at such other address, as the party shall specify in writing. A copy of any notice of a legal nature sent to Samples.com hereunder shall also be sent via email to legal@samples.com. Notice shall be deemed given: (i) upon personal delivery; (ii) if sent by fax or email, upon confirmation of receipt (by person or machine); (iii) if sent by certified mail, postage prepaid, three days after the date of mailing; and (iv) if sent by nationally recognized overnight courier service capable of verified receipt, upon the



day after the date on which the notice is delivered to the overnight courier for next day delivery (provided verified receipt is obtained by such courier).

**(c) Assignment**.  Neither party may assign, transfer, or delegate any of its rights or obligations under the Agreement without the prior consent of the other party; any attempts to do so shall be null and void.

**(d) Choice of Law/Venue**.  This Agreement shall be governed and construed in accordance with the laws of California.  The parties hereby agree to submit to the exclusive jurisdiction of the federal or state courts of the State of California, located in San Diego County for all disputes that arise under or relate to this Agreement.  The parties further agree to comply with all requirements necessary to give such court jurisdiction.  The prevailing party in any dispute arising from or related to this Agreement shall, in addition to any and all damages awarded, be entitled to an award of reasonable attorney's fees and costs.

**(e) Force Majeure.** Neither party shall be held responsible for any delay or failure in performance of this Agreement caused by fire, hurricane, tornado, earthquake, tidal wave, meteor strikes, civil war, Internet brown-outs or black-outs, computer hacking, or acts of terrorists ("Force Majeure") if the effects of such Force Majeure could not have been avoided through the application of reasonable foresight or diligent effort. Notwithstanding the foregoing, a shortage of funds is never an event of Force Majeure.

**(f) Non-Waiver/Severability**.  The failure of either party to enforce performance by the other party of any provision of this Agreement or to exercise any right under this Agreement shall not be construed as a waiver of such party's right to assert such provision.  If any portion of this Agreement is ruled by a court of competent jurisdiction to be unlawful, void, or for any reason unenforceable, then, to the maximum extent permitted by law, the provision shall be reformed to reflect the intent of the parties, or if the provision cannot be so reformed, it shall be severed from the contract, and such severance shall not affect the validity and enforceability of the remaining provisions of this Agreement.

**(g) Relationship of the Parties**.  The parties hereto are independent contractors.  There is no relationship of partnership, joint venture, employment or franchise relationship between the parties.  Neither party has the authority to bind the other or incur any obligation on its behalf.

**(h) Entire Agreement**.  This Agreement, together with the IOs, is the complete agreement between the parties with respect to the subject matter hereof, and supersedes and replaces all prior agreements, communications, and understandings (both written and oral) regarding such subject matter.  The terms and conditions of this Agreement will prevail over any contrary or inconsistent terms in any other writing.  Any electronic terms either party may be required to accept of the other party shall be of no force and effect, even if such acceptance occurs prior to, contemporaneous with, or subsequent to this Agreement or an IO.  This Agreement may only be modified by a written document executed by both parties.



I HAVE READ AND AGREE TO THE TERMS SET FORTH IN THIS AGREEMENT.

SAMPLES.COM, LLC

BY (SIGNATURE): _____

NAME: Josh Ogle

TITLE: CEO

DATE: 9/12/2016

ADVERTISER:

BY (SIGNATURE): _____

NAME: Alex Andebeek

TITLE: CEO

DATE: 9/12/2016

PUBLISHER SERVICES
AGREEMENT

CONFIDENTIAL
v.4.25.2016

# EXHIBIT B

<u>**REVENUE SHARE AGREEMENT**</u>

This Revenue Share Agreement (the "Agreement"), entered into on $\underline{\hspace{1cm}}$ 9/17/2016
(the "Effective Date"), is made by and between Samples.com, LLC ("Samples") and
Global Ventu Holding BV ("Global Ventu") in connection with the advertising and
marketing services provided by Global Ventu for Samples.

   **WHEREAS**, Global Ventu is in the business of Internet marketing and
advertising, and has experience and expertise in media buying via social media,
specifically Facebook;

   **WHEREAS**, Samples is the owner of several social media accounts, specifically
Facebook;

   **WHEREAS**, Samples wishes to engage Global Ventu to provide the Services
provided herein under a revenue sharing schedule in accordance with the terms and
conditions contained in this Agreement;

   **NOW THEREFORE**, in consideration of the mutual promises contained herein
and for other good and valuable consideration, the receipt of which are hereby
acknowledged, the parties agree as follows:

  1. <u>Services</u>. Samples will provide Global Ventu with access to its social media
account(s) ("Facebook Account") following the Effective Date solely for the purpose of
providing the services detailed herein. Global Ventu shall be responsible for general
oversight and management of the Facebook Account, which includes, but is not limited
to: (1) developing and optimizing existing campaigns; (2) managing budgets for
campaigns; and (3) planning, buying, and executing campaigns. Global Ventu represents
and warrants that it will perform the Services in a professional and workmanlike manner,
consistent with industry standards.

  2. <u>Ownership</u>. Neither this Agreement nor its performance transfers any of
Samples' proprietary property, including: designs, content, advertisements,
documentation, copy, images, and any related intellectual property (the "Intellectual
Property") rights from either party to the other party. The Intellectual Property shall at
all times be and remain the sole property of the original party. Furthermore, the
Facebook Account shall also remain the sole property of Samples, and Samples may
reject any of Global Ventu's postings or actions at any time and for any reason. Should
either Samples or Global Ventu create any advertisements, creatives, copy, or any other
related intellectual property, the new creations will remain the property of the party
which created such intellectual property.

  3. <u>Reporting</u>. Samples will provide daily revenue reporting to Global Ventu. About
ten days following the end of the month, Samples will provide Global Ventu with a final
report based on accounting numbers related to the profit and revenue made from Global
Ventu's efforts with the Facebook Account. Global Ventu shall have five (5) business

DocuSign Envelope ID: 770FDFC0-3583-47P2-A4CF-084AE3DFD5A9

days from receipt of a report to notify Samples of any dispute relating to the report. The
Parties shall work together to resolve the dispute. If Global Ventu does not have any
disputes related to the report, Global Ventu shall provide Samples with an invoice.

4.    <u>Revenue Sharing Schedule</u>. In consideration for the services performed
hereunder, Global Ventu shall be entitled to a revenue share percentage based upon
Samples' earnings directly attributable to Global Ventu's oversight and management of
the Facebook Account. Upon receiving an invoice from Global Ventu, Samples shall pay
Global Ventu within thirty (30) days of the end of the month for which services were
performed. "Revenue" shall be defined as the amount earned for a particular month less
media costs and expenses (e.g. Facebook media buy spend). Revenue shall be an 84% /
16% split, whereby Global Ventu will receive 84% of all revenue earned for the
Facebook Account and Samples will retain 16% of all revenue earned for the Facebook
Account.

Should the monthly Revenue be less than the media costs and expenses, Samples shall
deduct such costs from Global Ventu's account under the Publisher Services Agreement,
signed by the parties on September 12, 2016. If Global Ventu's account under the
Publisher Services Agreement does not contain sufficient funds to deduct from, Global
Ventu shall pay Samples the remainder of what is owed after deducting from Global
Ventu's account.

5.    <u>Termination</u>. Either party may terminate this Agreement by providing the other
party with two (2) business days prior written notice. Either party may terminate this
Agreement immediately if it learns of, or has good reason to suspect that the other party
has breached any material provision or express warranty of this Agreement. Upon
termination, Global Ventu's access to the Facebook Account shall be withdrawn.
Notwithstanding anything contained herein to the contrary, Samples' obligation to pay
Global Ventu for Revenue earned prior to the Termination Date shall not be terminated
until such payment is made, and any provisions of this Agreement that may reasonably be
expected to survive termination or expiration of the Agreement, shall survive and remain
in effect and accordance with their terms.

6.    <u>Confidential Information</u>.  For purposes of the Agreement, "Confidential
Information" means: (a) any confidential, proprietary, or trade secret information that
Samples discloses or makes available to Global Ventu that is marked "confidential" or
"proprietary" before its disclosure; (b) information that is orally disclosed by Samples to
Global Ventu if it is identified as confidential at the time of its disclosure; (c) information
that a reasonable party would deem to be non-public information and confidential; (d)
any and all financial and/or accounting information disclosed by Samples; or (e)
information that relates to Samples' products, services, technologies, clients/customers,
information systems, processes, marketing, and/or business plans and strategies.
Confidential Information does not include information that: (a) is in or enters the public
domain without breach of this Agreement; (b) Global Ventu lawfully receives from a
third party without restriction on disclosure and without breach of a nondisclosure
obligation; (c) Global Ventu lawfully knew, not in contravention of an obligation of

confidence, prior to receiving such information from the Disclosing Party; or (d) the Global Ventu develops independently without use of or reliance on the Disclosing Party's Confidential Information.

Global Ventu agrees that: (a) it will not, for any reason or under any circumstance at any time, directly or indirectly use, convert, apply, appropriate, employ, alter, transform, assign, put into operation, or otherwise use any Confidential Information, in whole or in part, for any purposes whatsoever, other than as expressly permitted herein; (b) it will not disclose to any third party the Confidential Information, except as expressly permitted in this Agreement or as otherwise necessary to perform its obligations or exercise its rights under the Agreement; and (c) it will take all reasonable measures to maintain the confidentiality of all Confidential Information in its possession or control. Notwithstanding the foregoing, Confidential Information may be disclosed as necessary to comply with the requirements of legal or administrative processes, provided that Global Ventu provide Samples with reasonable advance notice of any such intended disclosures and cooperates reasonably with its efforts to obtain a protective order.

7.  <u>Indemnification</u>. Each party (the "Indemnifying Party") agrees to indemnify, defend, and hold harmless the other party and its directors, officers, employees and agents (the "Indemnified Party") from and against any and all actions, claims, demands, proceedings, liabilities, judgments, demands, costs, penalties, and expenses, including reasonable attorneys' fees and related costs (collectively, "Losses") which: (i) arise solely or in part from the act(s) or omissions of the Indemnifying Party; or (ii) arise from or are related to a breach by the Indemnifying Party of any express representation or warranty contained herein.  Furthermore, Global Ventu will indemnify and hold Samples harmless from any Losses related to Global Ventu's management of the Facebook Account.  The Indemnified Party will promptly notify the Indemnifying Party of any such claim of which it becomes aware and will (i) provide reasonable cooperation to the Indemnifying Party at the Indemnifying Party's expense in connection with the defense or settlement of any such claim; and (ii) be entitled to participate at its own expense in the defense of any such claim.  The Indemnified Party agrees that the Indemnifying Party will have sole and exclusive control over the defense and settlement of any such third party claim. However, the Indemnifying Party will not acquiesce to any judgment or enter into any settlement that adversely affects the Indemnified Party's rights or interests without the prior written consent of the Indemnified Party.

8.  <u>Disclaimer and Limitation of Liability</u>.  EXCEPT AS PROVIDED HEREIN, THE SERVICES PROVIDED UNDER THIS AGREEMENT ARE PROVIDED ON AN "AS IS, AS AVAILABLE" BASIS.  SAMPLES DOES NOT GUARANTEE THAT THE SERVICES WILL GENERATE REVENUE FOR GLOBAL VENTU.  EXCEPT AS SPECIFICALLY PROVIDED IN THE AGREEMENT, EACH PARTY EXPRESSLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, OR CONDITIONS IN CONNECTION WITH THIS AGREEMENT, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OF TITLE, OF USAGE OF TRADE, OF COURSE OF

DocuSign Envelope ID: 770FDFC4-35E8-47B3-A4CE-084AE3DFD5A9

DEALINGS, OF ACCURACY OR COMPLETENESS OF RESULTS, DATA OR INFORMATION. EXCLUDING EACH PARTY'S INDEMNIFICATION AND CONFIDENTIALITY PROVISIONS HEREUNDER, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT, ECONOMIC, EXEMPLARY, AGGRAVATED, OR PUNITIVE DAMAGES WHATSOEVER ARISING OUT OF THIS AGREEMENT, EVEN IF SUCH DAMAGES WERE FORESEEABLE. EACH PARTY'S TOTAL CUMULATIVE LIABILITY HEREUNDER, FROM ALL CAUSES OF ACTION OF ANY KIND, SHALL BE LIMITED TO THE AMOUNTS PAID TO GLOBAL VENTU BY SAMPLES DURING THE SIX (6) MONTHS PRIOR TO THE DATE THE CAUSE OF ACTION AROSE.

9.      <u>Governing Law</u>.   This Agreement shall be governed by, and construed in accordance with the State of California.  The parties hereby agree to submit to the exclusive jurisdiction of the federal or state courts of San Diego County for all disputes arising from this Agreement.

10.      <u>Relationship of the Parties</u>.  The parties hereto are independent contractors.  There is no relationship of partnership, joint venture, employment or franchise relationship between the parties hereto.

11.      <u>Entire Agreement</u>.   This Agreement constitutes the complete understanding between the Parties with respect to the subject matter contained here, and supersedes and replaces all prior agreements, communications, and understandings regarding such subject matter.  This Agreement shall have no effect over any other patter between the Parties.  This Agreement may only be modified by a written document executed by both Parties.

**I have read and agree to the terms set forth in this Agreement.**

SAMPLES.COM, LLC

Signature: _____

Name:    Josh Ogle

Title:    CEO

Date:    9/16/2016

GLOBAL VENTU, BV

Signature: _____

Name:    Alex Andebeek

Title:    CEO

Date:    9/17/2016