

1  Christopher S. Morris, Esq., SBN 163188
   cmorris@morrislawfirmapc.com
2  Jacob A. Gillick, Esq. 312336
   jgillick@morrislawfirmapc.com
3  MORRIS LAW FIRM, APC
   501 West Broadway, Suite 1480
4  San Diego, CA 92101
   Telephone:  (619) 826-8060
5  Facsimile:  (619) 826-8065

6  Attorneys for Defendants Zeetogroup, LLC,
   Samples.com, LLC, and Tibrio, LLC
7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  GLOBAL VENTU HOLDING B.V.,          Case No. 19cv1018 DMS LL

12                    Plaintiff,        **DECLARATION OF JACOB A.**
                                        **GILLICK IN SUPPORT OF**
13         v.                           **DEFENDANTS/CROSS-**
                                        **COMPLAINANTS' MOTION FOR**
14  ZEETOGROUP, LLC,                    **LEAVE TO FILE SECOND**
    SAMPLES.COM, LLC, AND              **AMENDED CROSS-COMPLAINT**
15  TIBRIO, LLC,

16                    Defendants.       Date:      May 29, 2019
                                        Time:      1:30 p.m.
17  ZEETOGROUP, LLC,                    Dept:      13A
    SAMPLES.COM, LLC, AND              Judge:     Hon. Dana M. Sabraw
18  TIBRIO, LLC,

19             Cross-Complainants,

20         v.

21  GLOBAL VENTU HOLDING B.V.,
    ALEX ANDEBEEK, an individual,
22  and ROES 1 through 50, inclusive

23           Cross-Defendants.

24

25

26

27

28

                              1
   DECLARATION IN SUPPORT OF MOTION TO AMEND    19cv1018 DMS LL

I, Jacob A. Gillick, declare as follows:

1.      I am an Associate Attorney with Morris Law Firm, APC and represent Defendants/Cross-Complainants ZeetoGroup, LLC, ("Zeeto") and Tibrio, LLC ("Tibrio"). I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify as such.

2.      On December 18, 2019, initial disclosures were exchanged between the parties.

3.      As part of this exchange, Plaintiff produced 208 pages of documents. Some pages simply had pictures on it while the rest were conversations Alex Andebeek ("Andebeek"), Cross-Defendant and principal of Plaintiff Global Ventu Holding BV ("Global Ventu"), had with Zeeto and Tibrio employees.

4.      Pages 101 through 112 of the initial disclosures are chats between Corey Oneal ("Oneal"), a former employee of Tibrio, and Andebeek. A true and correct copy of GLOBAL000101 through GLOBAL000112 is attached hereto as "Exhibit 1."

5.      On pages 103-104 of Exhibit 1, Oneal, on behalf of Tibrio, tells Andebeek that it is "his choice to continue [the relationship] or not." In response, Andebeek states that he does not want to continue the relationship. Andebeek even declines to wait a couple of days/week before terminating the relationship and requests it immediately. Exhibit 1, p. 105. This shows that it was Andebeek and Global Ventu who terminated the agreement and requested an immediate pause, not Tibrio or Zeeto as alleged in Global Ventu's Complaint. Further, Andebeek tells Oneal that "if performance comes back up and you'd like to start back up then just let me know." *Ibid.*

6.      On page 106, Oneal asks if the ads should be paused, meaning all ads created by Global Ventu, to which Andebeek responds, "Okay, all ads are paused." This shows that Andebeek had control of the ads and there would have been no way for Zeeto and Tibrio to misappropriate ads.

2

7.      Andebeek, after being told that Tibrio revoked access to the Facebook Accounts, responds on page 106, "[y]eah man I'm sorry too, it is what it is."  This is contrary to the allegations made in the Complaint that Tibrio and Zeeto improperly locked Global Ventu out without notice.  This is also evidence that Global Ventu's claims are disingenuous and were designed solely to cause Zeeto and Tibrio harm with the help of counsel, Mr. Greco.

8.      On page 108, Oneal states that he was "thinking about [Andebeek's] decision to pause" and that it "turned out to be spot on."  Andebeek responds that "it wasn't an easy decision to pause."

9.      Oneal continues to tell Andebeek that he supports the termination of the relationship before making disparaging and false comments regarding the performance of Zeeto's proprietary software, ZAN.  Specifically, Oneal states that "it still has not recovered. . . they never invested time to understand why the old system outperformed, that is what I was trying to do when I get pulled away to complete the shitty migration play they put forward."  *Id.* at p. 108.

10.     As Andebeek and Oneal continue to chat, on page 109, Oneal improperly discloses that it was Tibrio's CEO, Stephan Goss, who was talking through Oneal during the negotiations with Global Ventu and gives Andebeek a behind-the-scenes look at the negotiation tactics of Mr. Goss and Tibrio.

11.     After disparaging Zeeto and Tibrio, Oneal tells Andebeek that he would "like to leave our communication open 😊. . . I might have some opportunity for you and I am entertaining a consulting gig I might want to get your advice on."  *Id.* at p. 110.

12.     In furtherance of his scheme to harm Tibrio, Oneal, on page 111, Oneal calls Zeeto and Tibrio employees "assholes."  On page 112 Oneal also improperly discloses to Andebeek a big change in management and the termination of around 25 people from Tibrio/Zeeto.  Cross-Complainants believe this was an attempt to disparage Zeeto so Oneal could work with Global Ventu.

3

13.    Attached hereto as "Exhibit 2" is the Proprietary Information and Inventions Assignment Agreement ("Agreement") between Oneal and Tibrio dated August 15, 2018.

14.    Section two of the Agreement discusses the duty of confidentiality. Exhibit 2(a).  Pursuant to this section, the following items are considered confidential:

    i.   Business practices

    ii.   Work-in-process

    iii.   Procedures

    iv.   Negotiation strategies

    v.   Traffic strategy

    vi.   Results from testing

    vii.   Notes

    viii.   Records

    ix.   Inventions

    x.   Strategies and plans for future business product formulations

    xi.   Pending negotiations

    xii.   Potential acquisitions or divestitures

    xiii.   Costs, commissions, fees, profits, sales, markets, revenue, pricing, strategies, accounting information

Exhibit 2.

15.    Section 3 of the Agreement specifies that the employee shall not "use Company's Confidential Information to solicit, divert, take away, or interfere with the Company's relationship with any and all of its customers with whom Employee had contact during his or her employment and/or regarding whom Employee obtained Confidential Information.  Employee acknowledges that in the event of a breach of this Section 2 by Employee, the Company will suffer irreparable harm and will be entitled to obtain injunctive relief, as well as other remedies available at

4

law or in equity, without the necessity of proving actual damages or posting a bond." *Ibid*.

16.    Finally, Section 5 of the "Agreement" specifies that the employee agrees "not to make and/or publish in any manner, any derogatory, defamatory or adverse statements, written or verbal, regarding the Company." *Id.*

17.    The chats, as described above, is evidence that Oneal breached the Agreement by disclosing confidential information and making defamatory statements.  Further, these chats show that Oneal intentionally interfered with prospective business advantages.

18.    Oneal was not immediately added to the instant lawsuit because of a pending dispute in arbitration brought by The Original Agency against Zeeto and Tibrio for over $50 million.

19.    This arbitration concluded on April 10, 2020.

20.    During the pendency of the arbitration, The Original Agency stated that they would be calling Oneal as a witness.

21.    Counsel for The Original Agency has been working with Andebeek and Mr. Greco, counsel for Andebeek, to harm Zeeto and Tibrio by whatever unprofessional avenues they can.  This includes, (1) attempting to influence a judge to treat Zeeto and Tibrio differently by bringing up old discovery rulings; (2) not granting a single discovery extension then claiming that the discovery responses were incomplete; and (3) Mr. Greco's perjurious statement that no discovery was received.  Further, as this Court is aware, Zeeto and Tibrio have offered multiple times to open the Facebook accounts in order to prove that no misappropriation took place.  Mr. Greco has declined each one of those requests and instead has employed discovery methods which will likely result in a motion for sanctions.

22.    Given the relationship between Mr. Greco and counsel for The Original Agency, Zeeto and Tibrio were positive that if Oneal was added to the lawsuit before the arbitration concluded, that addition would have been used to

1  argue that Zeeto and Tibrio were attempting to influence testimony.  Therefore,

2  Cross-Complainants waited until the arbitration concluded to add Oneal.

3      23.    Attached hereto as Exhibit 3 is a true and correct copy of the proposed

4  Second Amended Cross-Complaint.  Attached hereto as Exhibit 4 is the redlined

5  version f the proposed Second Amended Complaint.

6

7      I declare under penalty of perjury, under the law of the state of California,

8  that the foregoing is true and correct.  Executed this 17th day of April 2020, in San

9  Diego, California.

10

11  Jacob A. Gillick

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION IN SUPPORT OF MOTION TO AMEND    19cv1018 DMS LL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>INDEX OF EXHIBITS TO DECLARATION OF JACOB A. GILLICK IN SUPPORT OF DEFENDANTS/CROSS-COMPLAINANTS' MOTION FOR LEAVE TO FILE SECOND AMENDED CROSS-COMPLAINT</u>

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | Pertinent Documents Produced by Global Ventu | 8-20 |
| 2 | Agreement Signed by Corey Oneal | 21-33 |
| 3 | Proposed Second Amended Cross-Complaint | 34-49 |
| 4 | Redlined Proposed Second Amended Cross-Complaint | 50-66 |

DECLARATION IN SUPPORT OF MOTION TO AMEND    19cv1018 DMS LL

# EXHIBIT 1



GLOBAL000101



GLOBAL000102



GLOBAL000103



GLOBAL000104



GLOBAL000105



GLOBAL000106



GLOBAL000107



GLOBAL000108



GLOBAL000109



GLOBAL000110



GLOBAL000111



GLOBAL000112

# EXHIBIT 2

CONFIDENTIAL

tibrio

## PROPRIETARY INFORMATION
## AND
## INVENTIONS ASSIGNMENT AGREEMENT

This Proprietary Information and Inventions Assignment Agreement (the "Agreement") is entered into by and between Tibrio, LLC, a Delaware limited liability company (the "Employer" or "Company"), and _Lorey Oneil_, an individual (the "Employee") as of _____8/15/18_____ (the "Effective Date"). Employer and Employee may be referred to herein individually as a "Party" and collectively referred to as the "Parties."

       **WHEREAS**, Company offered Employee at-will employment pursuant to Company's Offer Letter, dated ____8/15/18____, and Employee accepted such terms and conditions contained therein; and

       **WHEREAS**, Employee understands and agrees that Employee's agreement to this Agreement is a condition to employment with the Company.

       **NOW THEREFORE**, in consideration of the Employee's employment by Company, which the Employee acknowledges to be good and valuable consideration for the Employee's obligations hereunder, the Parties, intending to be legally bound, hereby agree to the foregoing and as follows:

### "AT WILL" STATUS

    1.  "At-Will" Status. The Employee understands and acknowledges that the Employee shall remain an "at will" employee, this Agreement does not alter Employee's "at will" employment status, and this Agreement does not constitute an agreement relating to and/or affecting the duration of Employee's "at will" employment. The Company is an "at-will" employer, meaning that either the Company or the Employee can terminate the Employee's employment with the Company at any time and for any reason or for no reason at all.

### DUTIES OF EMPLOYEE

    2.  Duty of Confidentiality
        a.  Employee understands and acknowledges that during the course of employment by Company, Employee has and will have access to and come into contact with confidential, secret, and proprietary materials, and other confidential information, in tangible and intangible form, of and relating to the Company and/or its members, managers, officers, directors, employees, clients, consultants, business associates, partners, or joint-venturers ("Confidential Information"). Employee acknowledges and agrees that Employee is being provided access to such Confidential Information, subject to and solely based upon Employee's agreement to the covenants set forth in this Agreement and that Employee would not otherwise be afforded access to such information. Employee further understands and acknowledges that, as between the Parties, the Confidential Information constitutes Company's proprietary information and/or intellectual property, and Company's ability to reserve it for exclusive knowledge and use for Company is highly important and of great value to Company, so much that any improper use or disclosure of the Confidential Information will cause the Company irreparable harm, including financial costs, loss of business advantage, liability under agreements with third parties, civil damages, and criminal penalties. As such, if Employee breaches any of its confidentiality and non-disclosure obligations hereunder, Company shall be entitled to obtain injunctive relief as well as other remedies available at law or in equity, without the necessity of proving actual damages or posting a bond.

CONFIDENTIAL

tibrio

Company's Confidential Information includes, but is not limited to:

- Business processes, business practices, policies, plans, know-how, trade secrets, work-in-process, procedures, research methods, methods of compiling information, methods of creating the Company's systems and databases, procedures, devices, machines, equipment, data processing programs, software, computer models, research projects, and other means used by the Company in the conduct of its business;

- Advertising and marketing designs, advertising compilations, advertising information, negotiation strategies, design information, strategic elements to advertisements, marketing strategies, creative assets, traffic strategy, results from testing, results from reports, creative designs, media buy strategy;

- Algorithms, formulae, notes, reports, developments, records, research papers, operating systems, software design, web design, databases, code, models, experimental processes, inventions, experimental results, security procedures, studies, documents, and analysis;

- Strategies and plans for future business product formulations, potential transactions, marketing plans, pending negotiations, new business, product or other development, new and innovative product ideas, potential acquisitions or divestitures, and new marketing ideas;

- Information with respect to costs, commissions, fees, profits, sales, markets, revenue, pricing strategies, accounting information, accounting records, credit information, sales information, bidding techniques, sales methods and financial information;

- Metrics, mailing lists, the identity of the Company's Customers (as defined below), distributors and suppliers and their names and addresses, the names of customer representatives responsible for entering into contracts for the Company's products or services, the amounts paid by such Customers to the Company, Customer lists, client information, specific Customer needs and requirements, and leads and referrals to prospective Customers;

- The structure, sequence, and organization of the Company's database, together with source code and object code;

- The identity of the Company's employees, their respective salaries, bonuses, benefits, qualifications and abilities, but (with regard to this Section 2(a)) only to the extent that it will not restrict the Employee from discussing the Employee's wages and terms and conditions of employment with others; and

- Any and all Inventions (as defined below).

Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information, whether or not marked or otherwise identified as "confidential" or "proprietary," or that would appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Confidential Information can be in any form, including, but not limited to, oral, written, or machine readable, including electronic files. The Company has and will also have access to the confidential information of its Customers ("Customers" shall mean any and all Persons (as defined below) for whom the Company performs services and/or sells products or from whom the Company or Employee obtains information for the purpose of offering products and/or services). Confidential Information shall include not only information disclosed by the Company or its Customers to Employee in the course of his or her

CONFIDENTIAL



employment, but also information developed or learned by Employee during the course of his or her employment with Company, such as Inventions. Employee acknowledges and agrees that this Agreement does not obligate Company to disclose any information, including, without limitation, Confidential Information, to Employee.

b.   As of the Effective Date, and continuing after termination or expiration of Employee's employment with Company, Employee agrees to treat all Confidential Information in a strictly secret and confidential manner and shall not, without the prior written consent of the Company, directly or indirectly: (i) use, reproduce, disclose, publish, communicate, divulge, or otherwise permit access to all or any portion of the Confidential Information, or any tangible expressions or embodiments thereof, to any person, entity, firm, or company (collectively, "Person(s)"); (ii) use any Confidential Information in any manner other than to perform his or her employment for the Company and his or her obligations hereunder, all in accordance with and subject to the terms herein; and/or (iii) cause the transmission, removal, or transport of Confidential Information from the Company's principal place of business as set forth above. Notwithstanding anything to the contrary herein, nothing herein shall be construed to prevent disclosure of Confidential Information: (i) to Persons designated or employed by Company who need to know such information in connection with their work for Company; (ii) to Employee's legal counsel or accountants who have a "need to know" such information for the purpose of evaluating and/or enforcing Employee's rights under this Agreement (provided that such legal counsel and accountants agree to abide by the confidentiality provisions of this Agreement); (iii) as permitted under Section 2(g), below; and (iv) as may be required by applicable law or regulation, or pursuant to a valid order of a court of competent jurisdiction or an authorized government agency, provided that (1) Employee provides reasonable assistance to Company in opposing such disclosure or seeking a protective order or other limitations on disclosure; (2) Employee's disclosure does not exceed the extent of disclosure required by such law, regulation, or order; and (3) Employee shall promptly provide written notice of any such order to the Legal Department or the Human Resources Department within five (5) business days of receiving such order so that Company can seek a protective order or other remedy or waive its rights under this Section.

c.   Employee agrees to provide reasonable assistance as may be required by the Company to maintain the secrecy and confidentiality of the Confidential Information. Without limiting the generality of the foregoing, Employee shall promptly notify Company of any unauthorized use, release, or disclosure of any Confidential Information.

d.   Employee acknowledges that he or she understands the obligations set forth in this Agreement are not intended to prevent Employee from discussing Employee's wages and/or terms and conditions of Employee's employment with others.

e.   Employee shall not publish, authorize or cause to be published or otherwise assist or cooperate in the preparation or presentation of, any book, blog, post, tweet, article, interview, program or other production or publication of any kind, whether fiction or non-fiction (including, without limitation, by television, radio, newspaper or interactive media such as Facebook, Twitter or any other interactive social network or personal blog) that includes or makes use of any material or information that becomes available to Employee, whether or not related to Employee's services for Company, concerning the Confidential Information. Employee shall also not reverse engineer or attempt to derive the composition or underlying information, structure or ideas of any Confidential Information, no matter how such Confidential Information was obtained by Employee. Any gain or profit of any kind or nature obtained or derived by Employee from the use or exploitation of the Confidential Information shall be held in trust by Employee for the express benefit of Company and shall be remitted thereby to Company, unless Employee establishes that such use or exploitation did not violate the terms herein.

f.   Notwithstanding anything to the contrary herein, the confidentiality and non-disclosure obligations under this Section shall not apply to information that: (i) has become publicly known through

CONFIDENTIAL



no wrongful act of Employee; (ii) has been lawfully received from a third party without restriction on disclosure and without breach of this Agreement or other agreements of Company; or (iii) must be disclosed as required by law, subject to Section 2(b).

3.      Duty of Non-Solicitation of Customers. Employee agrees that he or she will not, without the prior written consent of the Company, directly or indirectly, individually or on behalf of others, use Company's Confidential Information to solicit, divert, take away, or interfere with the Company's relationship with any and all of its customers with whom Employee had contact during his or her employment and/or regarding whom Employee obtained Confidential Information during the last two (2) years of employment with the Company. Employee acknowledges that in the event of a breach of this Section 3 by Employee, the Company will suffer irreparable harm and will be entitled to obtain injunctive relief, as well as all other remedies available at law or in equity, without the necessity of proving actual damages or posting a bond.

4.      Duty of Non-Interference of Employees.  During the term of Employee's employment by Company and for one (1) year thereafter, Employee agrees that Employee will not solicit, raid, interfere with or otherwise disrupt the relationship between Employer and any of its employees, independent contractors or agents. Employee acknowledges that in the event of a breach of this Section 4 by Employee, the Company will suffer irreparable harm and will be entitled to obtain injunctive relief, as well as all other remedies available at law or in equity, without the necessity of proving actual damages or posting a bond.

5.      Duty of No Derogatory Statements.  Employee agrees not to make and/or publish in any manner, any derogatory, defamatory or adverse statements, written or verbal, regarding the Company or its current and former owners, directors, managers, members, officers, employees, agents, Affiliates, successors and/or assigns to anyone including, but not limited to, the Company's (or its successor's and/or assign's) directors, officers, employees, agents, vendors, existing Customers or potential Customers that Employee knows that the Company has targeted, or any other third party; provided, however, that the foregoing is neither intended to, nor shall, limit Employee's ability to testify truthfully in response to any valid subpoena or to engage in any other activity compelled or protected by law.

6.      Non-Compete.  During the term of Employee's employment with the Company, Employee agrees that he or she shall not directly and/or indirectly compete with or assist others to compete with the Company. Employee acknowledges and agrees that the Company is engaged in a highly competitive business and that by virtue of Employee's position and responsibilities with the Company, engaging in any business that is competitive with the Company will cause the Company great and irreparable harm, and in such case,  Company shall be entitled to obtain injunctive relief, as well as other remedies available at law or in equity, without the necessity of posting a bond.  If Employee's employment by Company is terminated (whether voluntarily or involuntarily), Employee hereby agrees that the Company may notify any Person employing Employee or evidencing an intention to employ Employee as the existence and terms of this Agreement, and Company may provide such Person with written documentation evidencing Employee's obligation to Company hereunder.

## INVENTIONS

7.      Disclosure of Inventions.  Employee acknowledges and agrees that during his or her employment with Company, the Employee may conceive certain inventions, improvements, developments, ideas, or discoveries that result from Employee's duties and services, whether developed solely or jointly with others, of any kind and nature whatsoever, tangible or intangible, to the extent the foregoing results and proceeds are created by such Employee: (a) within the scope of employment for Company, (b) using Company's Confidential Information, or any intellectual property of Company existing at the time prior to such creation, contribution, or work product by Company, or (c) using Company's resources or

CONFIDENTIAL

tibrio

facilities (collectively, "Inventions"). Inventions include, but are not limited to: ideas, concepts, inventions, discoveries, developments, plans, publications, research, strategies, techniques, agreements, documents, contracts, improvements, enhancements, agreement terms, know-how, computer programs, code, software design, web design, work in process, works of authorship, data, databases, results, reports, graphics, designs, drawings, algorithms, product plans, product designs, models, patents (including unpublished patent applications), formats, suggestions, arrangements, writings, tests, survey results, compositions, experimental processes, marketing information, advertising information, promotional and public relation concepts, and any other intellectual property or intangible rights, and any derivative works, modifications or amendments to any of the foregoing.

Except as set forth in Section 14 ("Employee Independent Works") and Section 12 ("Exceptions"), Company shall be the sole owner, in perpetuity, throughout the universe, in any and all languages, of all right, title, and interest in and to the Inventions. Accordingly, the Employee agrees to disclose to Company in confidence any and all Inventions that Employee solely or jointly conceives or reduces to practice while employed by Company.

8.    Assignment of Inventions. Employee acknowledges and agrees that all Inventions shall automatically become the sole property of Company as of the time of such Inventions' creation and are intended to be "works for hire" under the U.S. Copyright Act, 17 U.S.C. §101. To the extent that any Inventions are not automatically owned by Company upon creation, Employee hereby irrevocably assigns, transfers, and conveys to Company, for no additional consideration, and Company hereby accepts, all of Employee's right, title and interest throughout the world in and to all rights and materials related to or comprising the Inventions, and all intellectual property rights therein and thereto, including, but not limited to: (a) all copyrights and similar protections and renewals and extensions of copyright; (b) all patents, patent applications, patentable subject matters, and all issuances, divisions, continuations-in-part, reissues, extensions, re-examinations, and renewals thereof, and any subsequent patents with the same inventive subject matter; (c) all trademarks, trade names, service names, service marks, logos, trade dress, brand names and domain names, whether common law or otherwise, as well as all trademark registrations, applications and all issuances, extensions, and renewals thereof ("Trademarks") together with the goodwill of the business connected with the use of, and symbolized by, the Trademarks; (d) any and all causes of action that may have accrued or accrue in Employee's favor for infringement of the Inventions; (e) any and all royalties, fees, income, payments and other proceeds due or payable with respect to any and all of the foregoing; and (f) all other rights of any kind whatsoever of Employee accruing under any of the foregoing provided by the applicable law of any jurisdiction, by international treaties and conventions and otherwise throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit Company's right, title or interest in and to any Inventions or other intellectual property rights so as to be less in any respect than that Company would have had in the absence of this Agreement. Employee waives any and all rights that Employee may have or claim to have regarding the Inventions.

9.    Employee's Obligations. Employee agrees to cooperate with Company in executing the necessary documents to assign such Inventions to Company, if necessary. In addition, Employee shall, at the expense and on behalf of Company, cooperate with and do all acts and things requested by Company to obtain, establish, preserve, enforce and protect Employer's rights and interests in and to the Inventions, including, but not limited to, preparing and signing such applications, papers, instruments, and other documents as the Company may deem necessary for it to obtain and maintain patents, copyrights, trade secrets, and Trademarks within the United States, or elsewhere, or both.

10.    Power of Attorney. In the event Employee fails to promptly execute, acknowledge or deliver to Company any agreement, quitclaim, assignment, or other document necessary to apply for, prosecute, obtain, or enforce any patent, copyright, trademark, or other right or protection relating to any Invention, whether due to mental or physical incapacity or any other cause, Employee hereby irrevocably designates

CONFIDENTIAL



and appoints the Company and each of its duly authorized officers and agents as his or her agent and attorney-in-fact (which shall be deemed coupled with an interest), with full right, power and authority to act for and in his or her behalf and stead to execute and file any such document and to do all other lawfully permitted acts to further the prosecution, issuance, and enforcement of patents, copyrights, or other rights or protections with the same force and effect as if executed and delivered by the Employee.

11.     Moral Rights.  The foregoing assignment in Section 8 includes all rights of paternity, integrity, and disclosure, and any other rights that may be known as or referred to as "moral rights" (collectively, "Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law, Employee hereby waives such Moral Rights which may now or hereafter be recognized and consents to any action of Company that would violate such Moral Rights in the absence of such consent, including, without limitation, any right: (a) to approve such revisions, deletions, abridgments or other changes in the Inventions; or (b) to withdraw the Inventions from distribution.  Company shall have the right, but not the duty, to use, adapt and change the Inventions, or any part thereof, and to combine the same with other works, and to vend, copy, publish, reproduce, record, transmit, telecast by radio or television, perform, photograph with or without sound (including spoken words, dialogue and music synchronously recorded), and to communicate the same by any means now known or hereafter devised, either publicly or otherwise, and for profit or otherwise, throughout the world in perpetuity.

12.     Exceptions.  Notwithstanding any provision of this "Inventions" Section, Employee shall not be required to assign, nor shall he or she be deemed to have assigned, any of Employee's rights in any inventions or other work product that Employee retains as a matter of law under California Labor Code §2870 (reprinted in its entirety on **Exhibit A**, attached to this Agreement, and hereby incorporated herein by this reference)

13.     No Incorporation; License.  Employee shall not incorporate any intellectual property rights that are owned by any third party into any Invention without obtaining the prior written consent of Company.  To the extent that Employee incorporates any Employee Independent Works (as defined below) into any Invention with Company's prior written consent, then Employee hereby irrevocably grants to Company a royalty-free, fully paid-up, perpetual, transferable, irrevocable, worldwide, non-exclusive license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, offer to sell, sell, import, distribute and otherwise exploit such Employee Independent Works as part of or in connection with such Invention(s), and to practice any method related thereto.

## EMPLOYEE INDEPENDENT WORKS AND RELATIONSHIPS

14.     Employee Independent Works.  Except as disclosed on **Exhibit B**, attached to this Agreement and hereby incorporated by this reference, Employee does not know anything about the Company's Confidential Information, other than the information he or she has learned from the Company.  Employee has also disclosed on **Exhibit B** a complete list of all inventions, copyrighted material, patents, patent applications, original works of authorship, developments, and trade secrets proprietary to Employee or which Employee has any interest in, and that does not otherwise belong to Employee's previous employers or any third parties, and which Employee wants to exclude from the application of this Agreement (collectively, "Employee Independent Works").  The Company agrees to receive and hold all such disclosures in confidence.  Notwithstanding anything to the contrary, Employee understands and agrees that Employee is restricted from using Company's Confidential Information, resources, or facilities for any creation or development of its Employee Independent Works.

15.     Prior Commitments.  Employee has not entered into and shall not enter into any other agreements, relationships, or other commitments to any other Person that, during the term of the Employee's employment with Company, do or will conflict with Employee's obligations to the Company

tibrio

under this Agreement. Employee warrants that there is no other existing contract or duty on his or her part that conflicts with or is inconsistent with this Agreement.

16. <u>Proprietary Information and Trade Secrets of Others</u>. During the term of Employee's employment with Company, Employee will not improperly disclose to the Company, or improperly use, or induce the Company to improperly use, any confidential information or trade secrets of any former employer or any other Person to whom Employee owes a duty of confidentiality.

## SECURITY

17. <u>Security Access</u>. Employee represents, warrants, and covenants that he or she shall:

    a. comply with all Company security policies and procedures as in force as of the Effective Date, and as may be updated by Company from time to time, including, but not limited to, those regarding computer equipment, facilities access, key cards, access codes, social media and instant messaging systems, computer systems e-mail systems, computer networks, data security, passwords, document storage systems, and any and all other Company facilities and communication technologies ("Facilities and Access Resources");

    b. not access or use any Facilities and Access Resources, except as authorized in writing by Company;

    c. not access or use any Facilities and Access Resources in any manner following termination of employment with Company, whether termination is voluntary or involuntary.

Employee agrees to notify company promptly in the event Employee learns of or suspects any violation of the foregoing by others or any other misappropriation or unauthorized use, reproduction, or reverse engineering or tampering with any Facilities or Access Resources.

18. <u>Possession, Ownership, and Return of Company Property</u>. Company Property (as defined within) is, as between the Parties, the sole and exclusive property of Company, its Affiliates or its Customers. Upon termination (voluntary or otherwise) of Employee's employment with the Company, Employee shall immediately deliver and return to Company any and all Company property, including, without limitation, all documents and data pertaining to his or her employment and all Confidential Information of the Company and/or its Customers, and any other materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) furnished to Employee by Company, whether prepared by Employee or otherwise coming into his or her possession or control (collectively, "Company Property").

Within five (5) days after Employee's termination (voluntary or otherwise), Employee shall also complete, sign and return to the Company **Exhibit C** of this Agreement, attached hereto and hereby incorporated herein by this reference. Employee will not retain any written or other tangible material containing any information concerning or disclosing any Company Property. Further, Employee shall delete or destroy all copies of any such Company Property that remain in Employee's possession or control, including those stored on any non-Company devices, networks, storage locations. Employee recognizes that the unauthorized taking of any of the Company Property may be punishable as a crime. Employee acknowledges that knowingly accessing and extracting data from a computer system without authorization may be a crime, and that unauthorized taking of the Company's trade secrets or other Company Property could result in civil liability, and that wilful misappropriation may result in an award against Employee for triple the amount of the Company's damages and the Company's attorney's fees in collecting such damages.

CONFIDENTIAL

tibrio

## USE OF EMPLOYEE'S NAME AND IMAGE

19.    Use of Employee's Name and Image.  Company shall have the right to use the name, voice, photograph, likeness, and biographical data of Employee, as well as recordings, transcriptions, films, tapes, and other reproductions thereof, and Employee gives his or her consent to these uses for so long as the Company deems advisable for all legitimate business purposes of Company.  Employee hereby forever releases Company and its directors, officers, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after Employee's employment with Company in connection with Company's use of Employee's name, voice, photograph, or likeness.

## MISCELLANEOUS

20.    Modification of Agreement.  This Agreement may be modified or amended only with the written consent of both Employee and the Company.

21.    Entire Agreement. This Agreement, including all Exhibits attached hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof. This Agreement supersedes all prior and contemporaneous agreements, understandings, restrictions, warranties, or representations, whether written or oral, between the Parties relating to this subject matter.

22.    Severability, Interpretation.  If any term or provision of this Agreement or any portion thereof is declared illegal or unenforceable by any court of competent jurisdiction, such provision or portion thereof shall be deemed modified so as to render it enforceable, and to the extent such provision or portion thereof cannot be rendered enforceable, this Agreement shall be considered divisible as to such provision which shall become null and void, leaving the remainder of this Agreement in full force and effect. The Parties agree that any ambiguity set forth in this Agreement shall not be interpreted against the Company and that this Agreement shall be deemed drafted by both Employee and Company.

23.    Governing Law, Jurisdiction and Venue.  This Agreement shall be governed by the laws of California, without reference to its conflicts of law provisions.  Any action, suit or proceeding by either Party arising out of or relating to this Agreement shall be brought exclusively in any state or federal court located in the county of San Diego.  The Parties hereby irrevocably submit to the exclusive jurisdiction and venue in San Diego County courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

24.    Survival.  Employee agrees that the provisions contained in this Agreement shall survive any termination of Employee's employment with Company.

25.    Assignment and Successors.  This Agreement, and all of the rights and obligations hereunder, are not assignable, in whole or in part, by Employee, and any such attempted assignment shall be null and void.  This Agreement is freely assignable by Company.  Employee agrees that the terms of this Agreement shall inure to the benefit of and may be enforced by the Company and the Company's successors or assigns. Subject to the first sentence of this Section 25, Employee agrees that the terms of this Agreement shall be binding upon him or her and his or her executors, administrators, legatees, and other successors in interest.

26.    Payment of Costs and Attorneys' Fees.  If either Party institutes any legal action to enforce its rights hereunder or to recover damages for breach of the Agreement, the prevailing Party in such action shall be entitled to recover from the other Party all costs and expenses incurred in connection therewith, including, but not limited to, any attorneys' fees, attorneys' costs and court costs, in addition to any other relief to which that Party may be entitled.

27.    OPPORTUNITY FOR REVIEW.  EMPLOYEE ACKNOWLEDGES THAT HE OR SHE HAS READ THIS AGREEMENT IN ITS ENTIRETY AND HAS HAD REASONABLE OPPORTUNITY TO CONSULT WITH LEGAL AND FINANCIAL COUNSEL BEFORE EXECUTING THE AGREEMENT, THAT HE OR SHE FULLY UNDERSTANDS THE TERMS AND CONDITIONS HEREIN, AND THAT HE OR SHE IS NOT RELYING ON ANY STATEMENTS OR REPRESENTATIONS BY ANY PERSON, EXCEPT THOSE STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN.

28.    Waiver of Breach.  The waiver by either Party of a breach of any provisions of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach. A delay or failure by either Party to exercise a right under this Agreement, or a partial or single exercise of that right, shall not constitute a waiver of that or any other right.

29.    Counterparts, Electronic Copy.  This Agreement, for the convenience of the Parties, may be executed in any number of counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same Agreement.  A facsimile or electronic transmission with facsimile or electronic signatures of this fully executed Agreement constitutes and original and legally binding document.

30.    Notices.  Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given: (a) if delivered personally or by commercial messenger or courier service, then when actually delivered; (b) if sent by certified or registered mail, return receipt requested, then upon verification of receipt; or (c) if sent via e-mail or facsimile transmission, then upon acknowledgment of receipt, in each case addressed to the addresses set forth on the first page of this Agreement or to such other addresses may be specified upon written notice to the other Party.

EMPLOYEE ACKNOWLEDGES THAT THIS AGREEMENT AFFECTS EMPLOYEE'S RIGHTS TO INVENTIONS THAT EMPLOYEE DEVELOPS AND/OR CONCEIVES DURING HIS OR HER EMPLOYMENT, AND ADDITIONALY RESTRICTS EMPLOYEE'S RIGHT TO DISCLOSE OR USE THE COMPANY'S CONFIDENTIAL INFORMATION DURING OR SUBSEQUENT TO EMPLOYEE'S EMPLOYMENT.

EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS ITS TERMS. EMPLOYEE HAS COMPLETELY FILLED OUT **EXHIBIT B** TO THIS AGREEMENT AND HAS RECEIVED A COPY OF THIS WRITTEN NOTIFICATION.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**COMPANY**

BY (SIGNATURE): _____

JOSH OGLE, CEO

**EMPLOYEE**

BY (SIGNATURE): _____

PRINT NAME _____

CONFIDENTIAL

tibrio

## EXHIBIT A

## COMPANY'S WRITTEN NOTIFICATION TO EMPLOYEE OF
## CALIFORNIA LABOR CODE §2870

In accordance with California Labor Code § 2870, you are hereby notified that this Agreement does not require you to assign to Company certain inventions, and as further described below.

The following is the text of California Labor Code §2870:

"(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

I hereby acknowledge receipt of this written notification.

Dated: 8/31/18

By: _Corey O'neal_

Name: _____

- 10 -

CONFIDENTIAL



## EXHIBIT B

## EMPLOYEE STATEMENT

1.  Confidential Information. Except as detailed below, I hereby confirm that to the best of my knowledge I am currently unaware of any information pertaining to the Company's business, the Company Property, or Company's Customers, except what has been disclosed by the Company or its Customers directly to me [specify such information; if none, so state]

 

 

2.  Employee Independent Works. Except as detailed below, I hereby confirm that to the best of my knowledge, either personally or with others, I have not made or reduced to practice any inventions or other intellectual property [specify inventions (including a title, date of creation, a brief description, and any other applicable identifying information); if none, so state]

 

 

Dated:  8/31/18

By: Corey Oneil

Name:

## Exhibit C. Termination Certification

I hereby certify that to the best of my knowledge, I do not possess any Confidential Information, either in original or photocopied form, or other such documents, materials, equipment, or property under the ownership of the Company or its Customers.

I hereby further certify that to the best of my knowledge, I have been and will continue to be in compliance with each and every term outlined in the Invention Assignment and Non-Disclosure Agreement which bears my signature, including the reporting of any and all Work Product I conceived or made that are covered by that Agreement.

I hereby further certify that I will remain in compliance with the Proprietary Information and Invention Assignment Agreement by preserving as confidential all Confidential Information, Work Product, or other information with commercial value or other utility in the business in which the Company or its Customers are potentially engaged. I will not disclose unauthorized information that could be detrimental or harmful to the interests of the Company or its Customers, whether such information is identified by the Company or its Customers as confidential or not.

Upon termination of my employment with the Company, my employment will be with _____ in _____ Division and my work will be in connection with the following projects [describe projects briefly]:

_____

_____

Dated: 12/7/18



By: Corey Oneal

Print & Sign

PROPRIETARY INFORMATION AND
INVENTIONS ASSIGNMENT
AGREEMENT

PAGE 12 OF 12

CONFIDENTIAL
[v. 10.13.2015]

# EXHIBIT 3



Christopher S. Morris, Esq., SBN 163188
cmorris@morrislawfirmapc.com
Jacob A. Gillick, Esq. 312336
jgillick@morrislawfirmapc.com
MORRIS LAW FIRM, APC
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone:  (619) 826-8060
Facsimile:  (619) 826-8065

Attorneys for Defendants Zeetogroup, LLC,
Samples.com, LLC, and Tibrio, LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLOBAL VENTU HOLDING B.V., | Case No. 19cv1018 DMS LL |
| Plaintiff, | **DEFENDANT TIBRIO, LLC'S SECOND AMENDED CROSS-COMPLAINT** |
| v. | |
| ZEETOGROUP, LLC, SAMPLES.COM, LLC, AND TIBRIO, LLC, | Dept:     13A<br>Judge:    Hon. Dana M. Sabraw |
| Defendants. | |
| ZEETOGROUP, LLC, SAMPLES.COM, LLC, AND TIBRIO, LLC, | |
| Cross-Complainants, | |
| v. | |
| GLOBAL VENTU HOLDING B.V., ALEX ANDEBEEK, an individual, and ROES 1 through 50, inclusive | |
| Cross-Defendants. | |

1

## **INTRODUCTION**

1.     Facebook has become such a phenomenon, with 2.4 billion users, that an entire industry has emerged to service and run businesses' Facebook pages.  One of these companies is Cross-Defendant Global Ventu Holding, BV ("Global Ventu").

2.     In September of 2016, Cross-Complainant Tibrio, LLC ("Tibrio") hired Global Ventu to manage the Facebook advertising campaigns for Tibrio's websites, getitfree.us and samples.com.  Specifically, and according to the agreements between the parties ("Agreements"), either Tibrio or Global Ventu would create advertisements to be placed on Tibrio's Facebook page.  Once those advertisements were completed, Global Ventu would manage the campaign to make sure the advertisements received the most amount of clicks possible through the correct audience.

3.     According to the Agreements, Global Ventu promised not to use or share any of the intellectual property (advertisements and content) with anyone.  This provision is important because what makes Tibrio different and more profitable than other companies is the style of a border around an advertisement; what type of incentive is offered by an advertiser; and, the overall appeal of the website.  It took Tibrio years of research and hundreds of thousands of dollars to learn what worked the best.

4.     Global Ventu and Tibrio had a good working relationship until November of 2018, when Global Ventu threatened to discontinue services unless it received a higher profit share.  Tibrio was unable to meet this demand and thereafter Global Ventu terminated the relationship.  However, instead of just moving on, Global Ventu filed suit against Tirbio based on the separation.

5.     Unfortunately, Global Ventu's "revenge" mission does not stop at the lawsuit.  Recently, it was discovered that Global Ventu and its Chief Executive Officer, Alex Andebeek, have been using the trade secrets developed by Tibrio on a

Facebook page called "Get Free Samples" whose name is eerily similar to Tibrio's "Get it Free" Facebook page.  Upon further inspection, it was discovered that Cross-Defendants were using Tibrio's advertisements, imagery, and content for its own gain and in direct competition with Tibrio.

6.     Cross-Defendants' actions have caused damages far and above what they are claiming against Tibrio.  Tibrio now seeks the remedies as described below along with an order enjoining any further use of Tibrio's trade secrets.

## PARTIES

7.     Cross-Complainant Tibrio, LLC ("Tibrio") is owned and operated by ZeetoGroup, LLC and runs the websites getitfree.us and samples.com.  Tibrio is a Delaware Limited Liability Company conducting business in San Diego, California.  Tibrio entered into a contractual relationship with Cross-Defendant Global Ventu Holding, BV on or around September of 2016 which was terminated in November of 2018.  Tibrio created the advertisements and source material which have been misappropriated by Cross-Defendants.

8.     Cross-Defendant Global Ventu Holding, BV ("Global Ventu") is a Dutch corporation, with its principal place of business located in Sint Sebastiaansbrug 13 2611DN, Delft, The Netherlands.  Global Ventu is a target driven advertising agency specializing in lead generation and data acquisition, i.e., the generation of consumer interest into a business's products or services. Following the termination of the relationship between Tibrio and Global Ventu, Global Ventu used Tibrio's proprietary and confidential information without consent.  This has caused Tibrio financial and reputational harm.

9.     Cross-Defendant Alex Andebeek ("Andebeek") is the Chief Executive Officer of Global Ventu and was the main contact between Tibrio and Global Ventu.  Andebeek has used Tibrio's proprietary and confidential information without consent.  This has caused Tibrio financial and reputational harm.

/ / /

3

10.     Cross-Defendant Corey Oneal ("Oneal") is a former employee of Tibrio who worked with Global Ventu. Chat records between Andebeek and Oneal show that Oneal breached his employment agreement with Tibrio and likely interfered with Tibrio and Global Ventu's financial relationship.

## CONSPIRACY ALLEGATIONS

11.     On information and belief, at all relevant times hereto, Alex Andebeek ("Andebeek") and Global Ventu Holding, BV ("Global Ventu") conspired and planned, one with another, to misappropriate trade secrets from Tibrio, LLC ("Tibrio").  As joint tortfeasors, Andebeek and Global Ventu are both liable for the entire damage done in pursuance of the common design.

12.     Cross-Complainant is ignorant of the true name and capacities, whether individuals or otherwise of Cross-Defendants sued as Roes 1 through 100, inclusive, and therefore sues these Cross-Defendants by such fictitious names. Cross-Complainant will amend this Cross-Complaint to allege their true names and capacities when ascertained.  Cross-Complainant is informed and believes, and thereon alleges, that each of the fictitiously named Cross-Defendants are responsible in some manner for the occurrence alleged, and that Cross-Complainant's injuries herein alleged were proximately caused by such Cross-Defendants.

## ALTER EGO AND CONSPIRACY ALLEGATIONS

13.     "Under the alter-ego doctrine, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the other person or organization actually controlling the corporation, in most instances the equitable owners." *Sonara Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 538 (2000).

14.     "In California, two conditions must be met before the alter ego doctrine will be invoked.  First, there must be such a unity of interest and

4

ownership between the corporation and its equitable owner and that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonara Diamond Corp. v. Superior Court,* supra, 83 Cal.App.4th at 538.

15.    During all relevant times, Andebeek and Roes 1-100, were leaders and executives at Global Ventu Holding, BV ("Global Ventu").

16.    At all relevant times, Andebeek and Roes 1-100, as officers and shareholders, commanded, influenced, and controlled the affairs of Global Ventu. Andebeek and Roes 1-100 acted outside of any agency relationship afforded by Global Ventu's corporate status and in fact acted in such a way as to completely disregard and ignore any recognized corporate formalities or purpose with regards to Global Ventu's operation.

17.    At all relevant times, there existed a unity of interest and ownership between Global Ventu, Andebeek, and Roes 1-100 such that the individuality and separateness of Global Ventu, Andebeek, and Roes 1-100 caused to and in fact never did exist.

18.    Andebeek and Roes 1-100 used Global Ventu as a mere shell and naked framework for their own benefit.  In this regard, Andebeek and Roes 1-100 used Global Ventu as a conduit to conduct his/her personal business, property, and affairs and as a device to avoid individual liability.

19.    Upon information and belief, Andebeek, Global Ventu, and Roes 1-100 conspired and planned, one with another, to defraud Cross-Complainant by employing Tibrio's proprietary and confidential information.

20.    Andebeek, Global Ventu, and Roes 1-100 were members of this conspiracy from the inception.  As active participants in the conspiracy, Andebeek, Roes 1-100, and Global Ventu are joint tortfeasors liable for the entire damage done in pursuance of the common design.

5

## VENUE

21.    This Court has jurisdiction over this matter and personal jurisdiction over Plaintiff and Cross-Defendant as Global Ventu Holding, BV and Alex Andebeek have already initiated litigation in this Court and availed itself of the rights and privileges of this venue. This Court also has subject matter and personal jurisdiction over Cross-Defendant Corey Oneal pursuant to 28 U.S.C § 1367.

## STATEMENT OF FACTS

22.    Tibrio, LLC fka as Samples.com ("Tibrio") owns and operates two websites: samples.com and getitfree.us.  Both sites aggregate free samples ranging from cleaning supplies to snack foods and give them away to customers who visit the websites.  There is also a sweepstakes aspect to Tibrio's getitfree.us website whereby in exchange for answering certain questions, a consumer will be placed into a drawing.

23.    Tibrio generates revenue from those websites by, (1) connecting consumers to advertisers, and (2) allowing advertisers to put ads on the websites. In order to command the highest price possible, Tibrio has spent years developing the details of samples.com and getitfree.us which attract visitors and encourage them to click on advertisements or connect with a relevant advertiser.

24.    One specific method of attracting consumers to the websites is through Facebook advertising and marketing.  This includes creating a specific advertisement, locating the proper consumer demographic, paying Facebook to post the advertisement, and tracking of the consumers who click the advertisement.

25.    There are specific companies who specialize in Facebook advertising, including Cross-Defendant, Global Ventu Holding, BV run by Alex Andebeek ("Global Ventu" and "Andebeek").

26.    On or around September 12, 2016, Tibrio entered into a Publisher Services Agreement with Global Ventu.

/ / /

27.     According to this Publisher Services Agreement, Tibrio agreed to create applicable advertisements to be posted on Tibrio's Facebook page which Global Ventu would then monetize.

28.     Global Ventu agreed that it will "only distribute Advertising Material internally and shall not distribute or re-sell Advertising Material to any external third party without Advertiser's written consent."  Global Ventu also agreed that it would not "copy, reproduce or create derivative works of the Advertising Material for any purpose outside of [the] Agreement."

29.     Further, Global Ventu agreed that it will not "use Affiliates or Sub-Affiliates without Advertiser's prior written consent."  This would include such affiliates like Fluent, whom Tibrio was creating ads for during the time Global Ventu was working with Tibrio.

30.     On September 17, 2016, Tibrio and Global Ventu entered into a separate Revenue Share Agreement.

31.     Pursuant to the Revenue Share Agreement, Global Ventu agreed to be responsible for general oversight and management of Tibrio's Facebook account "which includes, but is not limited to: (1) developing and optimizing existing campaigns; (2) managing budgets for campaigns; and (3) planning, buying, and executing campaigns."

32.     This Revenue Share Agreement specified that "should either [Tibrio] or Global Ventu create any advertisements, creatives, copy, or any other related intellectual property, the new creations will remain the property of the party which created such intellectual property."

33.     Finally, the Revenue Share Agreement's "Confidential Information" provision provides that the parties will not "for any reason or under any circumstance at any time, directly or indirectly use, convert, apply, appropriate, employ, alter, transform, assign, put into operation, or otherwise use any Confidential Information, in whole or in part, for any purpose whatsoever."

7

34.    Over the next two years, Global Ventu and Tibrio had a good working relationship and were making good money together.

35.    In November of 2018, Tibrio was preparing to move its backend technology to a platform called ZAN, which was developed by Tibrio's parent company, ZeetoGroup, LLC.  As with any launch of a new product, it was expected that there would be a slight downturn in revenue until all of the issues were worked out.

36.    Unfortunately, instead of looking into the future and continuing the lucrative relationship, Global Ventu took this move to ZAN as an opportunity to try and extort more money out of Tibrio.  Following some negotiations, Global Ventu refused to continue the relationship.  Global Ventu then sued Tibrio and its parent company for this separation.

37.    Following that separation, it was discovered that Corey Oneal ("Oneal"), a former employee of Tibrio, maintained contact with Andebeek. Throughout these communications, Oneal seems to support the separation and discloses confidential information including, but not limited to, ZAN testing/implementation, negotiation strategies, and testing results.

38.    Oneal entered into a Proprietary Information and Inventions Assignment Agreement ("Confidentiality Agreeement") on August 15, 2018. A true and correct copy of the Confidentiality Agreement is attached hereto as "Exhibit 1." Pursuant to section two of the Confidentiality Agreement, Oneal, during and after his employment with Tibrio, had a duty to keep confidential things such as business practices and testing results. *Id.* at § 2. Further, Oneal had a duty not to make derogatory statements. *Id.* at § 5. The Confidentiality Agreement was breached by Oneal through his communications with Andebeek.

39.    The chats between Oneal and Andebeek also show that Oneal interfered with Global Ventu and Tibrio working together again after ZAN stabilized. During the termination correspondence, Andebeek stated that he would

8

be willing to work with Tibrio again in the future and that it was not an easy
decision to pause all traffic. Unfortunately, following those representations, Oneal
told Andebeek that the entire ZAN platform was not doing well and that Tibrio was
failing and terminating employees. To top off his plan, Oneal solicited Global
Ventu personally to work together in the future. Cross-Complainants believe that
had Oneal not acted the way he did, this lawsuit may have been avoided and the
parties would likely be working together today.

40.     After months of litigation, one of Tibrio's employees, while on
Facebook, ran into a Facebook page called "Get Free Samples" which is eerily
similar to Tibrio's "Get it Free" Facebook page.  Upon further inspection, it was
discovered that this page was using the Tibrio brand and assets without permission.
This includes, (1) the Facebook page cover photo, (2) Facebook page story copy,
and (3) product images.  This site is being run by Global Ventu and is neither
owned nor operated by either ZeetoGroup, LLC or Tibrio.

41.     This kind of misappropriation not only diverts traffic away from
Tibrio, but also negatively impacts Cross-Complainant's business by association.

42.     Global Ventu has been using Tibrio's property to improperly solicit
clients away from Tibrio.  This has caused Tibrio financial and reputational harm.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS- CALIFORNIA CIVIL CODE SECTION 3426.1

## (CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND ROES 1-100)

43.     Cross-Complainant re-alleges and incorporates all of the above
paragraphs as though fully set forth herein.

44.     Cross-Complainant owns the proprietary and confidential information
which qualifies as trade secrets ("Trade Secrets").  This includes advertisements

9

and content.  These Trade Secrets provide a commercial advantage as defined by California Civil Code section 3426.1(d).

45.    At the time of their misappropriation, the Trade Secrets were not authorized to be used by anyone outside of Tibrio.

46.    Cross-Defendants have improperly used the Trade Secrets in order to harm Tibrio.

47.    The improper means used by Cross-Defendants was a direct breach of the agreements entered into between the parties.

48.    Cross-Defendants were aware that they had misappropriated the trade secrets of Tibrio by improper means.

49.    Cross-Defendants' acquisition was a substantial factor in causing Tibrio's harm and Cross-Defendants were unjustly enriched.

50.    The actions of Cross-Defendants qualify as willful and malicious misappropriation and therefore, the Court should award exemplary damages as provided by California Civil Code section 3426.3(c).

## SECOND CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS- 18 U.S.C.S SECTION 1832 ET AL.

## (CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND ROES 1-100)

51.    Cross-Complainant re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

52.    Cross-Complainant owns and possesses certain confidential and trade secret information as alleged above.

53.    Cross-Complainant's Trade Secrets relate to products and services used, sold, shipped, and/or ordered in, interstate or foreign commerce.

54.    Cross-Complaint has taken reasonable measures to keep such information secret and confidential.

10

55.     Cross-Complainant's confidential Trade Secret information derives independent value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

56.     Cross-Defendants have misappropriated Tibrio's Trade Secrets in the improper and unlawful manner as alleged herein.

57.     Cross-Defendants' wrongful conduct in misappropriating Tibrio's Trade Secret, unless and until enjoined and restrained by order of this Court, will cause great and irreparable harm to Tibrio.

58.     Tibrio is threatened with losing the value of its advertisements along with current and potential business with top advertisers.  Tibrio will continue to suffer irreparable injury that cannot be adequately remedied at law unless Cross-Defendants are enjoined from engaging in any further acts of misappropriation.

59.     Each of the acts of misappropriation were done willfully and maliciously by Cross-Defendants with the deliberate intent to injure Tibrio's business and improve their own for financial gain.  This entitles Tibrio to exemplary damages and/or attorneys' fees to be proven at trial.

## THIRD CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

## (CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND ROES 1-100)

60.     Cross-Complainant re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

61.     Cross-Defendants intentionally interfered with the economic relationships between Tibrio and Fluent, which probably would have resulted in an economic benefit to Cross-Complainant.

/ / /

1  62.    Cross-Defendants knew of Cross-Complainant's relationship with

2  Fluent, and intentionally acted in any way which disrupted the relationship.

3  63.    Due to Cross-Defendants' act, Cross-Complainant's relationship with

4  Fluent was actually disrupted.

5  64.    As a result, Cross-Complainant suffered economic harm, and Cross-

6  Defendant's conduct was a substantial factor in causing such harm.

7  **FOURTH CAUSE OF ACTION**

8  **UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES**

9  **PURSUANT TO CALIFORNIA BUSINESS AND PROFESSIONS CODE**

10  **SECTION 17200**

11  **(CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND**

12  **ROES 1-100)**

13  65.    Cross-Complainant re-alleges and incorporates all of the above

14  paragraphs as though fully set forth herein.

15  66.    California Business and Professions Code section 17200 prohibits

16  unlawful, unfair, or fraudulent business acts.

17  67.    On Cross-Defendants' Facebook page called "Get Free Samples,"

18  Cross-Defendants used advertisements, imagery, and content that are identical or

19  nearly identical as those on Cross-Complainant's Facebook page "Get it Free."

20  68.    Cross-Defendants' actions are fraudulent as the public is likely to be

21  deceived by Cross-Defendants' intentional replication of Cross-Complainant's

22  Facebook page.

23  69.    Cross-Defendants' actions are unfair because they are unjustly

24  benefitting and taking advantage of Cross-Complainant's work, which harms

25  Cross-Complainant's reputation and competitiveness.

26  70.    Due to the practices of Cross-Defendants, Tibrio has suffered material

27  damages in an amount to be proven at trial.

28  / / /

12

# FIFTH CAUSE OF ACTION

# BREACH OF CONTRACT

# (CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND ROES 1-100)

71.     Cross-Complainant re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

72.     The Publisher Service Agreement and Revenue Share Agreements entered into between the parties required Cross-Defendants to refrain from using the Trade Secrets for any other reason than that described by the agreements i.e., running campaigns for Tibrio through Facebook.

73.     Cross-Defendants breached this agreement by using the Trade Secrets on a site designed to look like Tibrio's without Tibrio's consent.  Tibrio complied with all obligations under the agreement.

74.      This clear breach of duties set forth in the contract have caused Tibrio damages.

75.     On August 15, 2018, Corey Oneal ("Oneal") entered into a Proprietary Information and Inventions Agreement ("Confidentiality Agreement") with Tibrio. See Exhibit 1. The terms of the Confidentiality Agreement required Oneal to keep confidential certain things such as business practices, negotiation strategies, results from testing, sales, revenue, and accounting information. Exhibit 1, § 2. Further, Oneal also had an obligation not to make derogatory statements regarding Tibrio.

76.      In the chats produced by Cross-Defendants, Oneal, following Global Ventu's termination of the relationship, (1) tells Andebeek that things are "bad" at Tibrio; (2) discloses information regarding employee terminations; (3) praises Andebeek's decision to terminate the parties' relationship; (4) discusses performance of Zeeto's proprietary platform, ZAN, during testing and; (5) discloses the negotiations strategy used by Stephan Goss, Tibrio's CEO, with Global Ventu. These comments constitute breaches of the Confidentiality Agreement.

13

77.    Tibrio complied with all obligations under the Confidentiality
Agreement and Oneals breach has caused damages to Plaintiffs.

**SIXTH CAUSE OF ACTION**

**INTERFERRENCE WITH PROSPECTIVE BUSINESS ADVANTAGES**
**(CROSS-COMPLAINANT AGAINST COREY ONEAL AND ROES 1-100)**

78.    Cross-Complainant re-alleges and incorporates all of the above
paragraphs as though fully set forth herein.

79.    Global Ventu and Tibrio have had a financial relationship and
following the termination, there was the possibility of future economic benefit.
Oneal had knowledge of this relationship.

80.    According to the initial disclosures produced by Plaintiff, on
November 17, 2018, Andebeek, during termination discussions, told Tibrio that "if
performance comes back up and you'd like us to start back up then just let me
know." However, following the termination and Oneal leaving Zeeto, Oneal made
comments to Andebeek such as "[Zeeto] never invested time to understand why the
old system outperformed… that is what I was trying to do when I got pulled away
to complete the shitty migration plan they put forward." Mr. O'Neal also told
Andebeek that his decision to pause "turned out to be spot on."

81.    Following Andebeek's statement regarding Global Ventu's willingness
to work together in the future, and Oneal's disparaging comments in response,
Oneal personally solicited Andebeek by writing that he "might have some
opportunity for [Global Ventu] and I am entertaining a consulting gig I might want
to get your advice on."

82.    Oneal persuaded Global Ventu not to wait for the ZAN platform to
find its footing and instead convinced Andebeek to work with Oneal elsewhere.

83.    Oneal knew of the economic relationship along with the possibility for
a future relationship and acted intentionally to disrupt that relationship. This
resulted in a lawsuit against Zeeto and Tibrio and likely deprived all parties of

14

revenue they would have received working together now that ZAN has been performing.

## <u>REQUEST FOR JURY</u>

1.      Cross-Complainant hereby requests a jury trial in this action.

## <u>PRAYER FOR RELIEF</u>

1.      Damages in an amount to be proven at trial;

2.      For reasonable attorney's fees;

3.      For a preliminary injunction/temporary restraining order;

4.      For exemplary damages;

5.      For pre-judgment and post-judgment interest, according to proof;

6.      For costs of suit incurred herein; and,

7.      For such other and further relief as this Court deems just and proper.


**MORRIS LAW FIRM, APC**

Dated:  April 17, 2020    _____
Jacob A. Gillick, Esq.
jgillick@morrislawfirmapc.com
Attorneys for Defendants Zeetogroup, LLC,
Samples.com, LLC, and Tibrio, LLC

15

# EXHIBIT 4

1  Christopher S. Morris, Esq., SBN 163188
2  cmorris@morrislawfirmapc.com
   Jacob A. Gillick, Esq. 312336
3  jgillick@morrislawfirmapc.com
4  MORRIS LAW FIRM, APC
   501 West Broadway, Suite 1480
5  San Diego, CA 92101
6  Telephone:  (619) 826-8060
   Facsimile:  (619) 826-8065
7
8  Attorneys for Defendants Zeetogroup, LLC,
   Samples.com, LLC, and Tibrio, LLC
9
                    UNITED STATES DISTRICT COURT
10
                  SOUTHERN DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| 12  GLOBAL VENTU HOLDING B.V., | Case No. 19cv1018 DMS LL |
| 13              Plaintiff, | **DEFENDANT TIBRIO, LLC'S** |
| 14 | <span style="color:red">**SECOND**</span> **AMENDED CROSS-** |
|        v. | **COMPLAINT** |
| 15 | |
| 16  ZEETOGROUP, LLC, | Dept:     13A |
|     SAMPLES.COM, LLC, AND | Judge:   Hon. Dana M. Sabraw |
| 17  TIBRIO, LLC, | |
| 18              Defendants. | |
| 19 | |
| 20  ZEETOGROUP, LLC, | |
|     SAMPLES.COM, LLC, AND | |
| 21  TIBRIO, LLC, | |
| 22          Cross-Complainants, | |
| 23 | |
|        v. | |
| 24 | |
| 25  GLOBAL VENTU HOLDING B.V., | |
|     ALEX ANDEBEEK, an individual, | |
| 26  and ROES 1 through 50, inclusive | |
| 27 | |
| 28          Cross-Defendants. | |

1

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

## **INTRODUCTION**

1.      Facebook has become such a phenomenon, with 2.4 billion users, that an entire industry has emerged to service and run businesses' Facebook pages.  One of these companies is Cross-Defendant Global Ventu Holding, BV ("Global Ventu").

2.      In September of 2016, Cross-Complainant Tibrio, LLC ("Tibrio") hired Global Ventu to manage the Facebook advertising campaigns for Tibrio's websites, getitfree.us and samples.com.  Specifically, and according to the agreements between the parties ("Agreements"), either Tibrio or Global Ventu would create advertisements to be placed on Tibrio's Facebook page.  Once those advertisements were completed, Global Ventu would manage the campaign to make sure the advertisements received the most amount of clicks possible through the correct audience.

3.      According to the Agreements, Global Ventu promised not to use or share any of the intellectual property (advertisements and content) with anyone.  This provision is important because what makes Tibrio different and more profitable than other companies is the style of a border around an advertisement; what type of incentive is offered by an advertiser; and, the overall appeal of the website.  It took Tibrio years of research and hundreds of thousands of dollars to learn what worked the best.

4.      Global Ventu and Tibrio had a good working relationship until November of 2018, when Global Ventu threatened to discontinue services unless it received a higher profit share.  Tibrio was unable to meet this demand and thereafter Global Ventu terminated the relationship.  However, instead of just moving on, Global Ventu filed suit against Tirbio based on the separation.

5.      Unfortunately, Global Ventu's "revenge" mission does not stop at the lawsuit.  Recently, it was discovered that Global Ventu and its Chief Executive Officer, Alex Andebeek, have been using the trade secrets developed by Tibrio on a

1  Facebook page called "Get Free Samples" whose name is eerily similar to Tibrio's
2  "Get it Free" Facebook page.  Upon further inspection, it was discovered that
3  Cross-Defendants were using Tibrio's advertisements, imagery, and content for its
4  own gain and in direct competition with Tibrio.

5       6.    Cross-Defendants' actions have caused damages far and above what
6  they are claiming against Tibrio.  Tibrio now seeks the remedies as described below
7  along with an order enjoining any further use of Tibrio's trade secrets.

8  **PARTIES**

9       7.    Cross-Complainant Tibrio, LLC ("Tibrio") is owned and operated by
10  ZeetoGroup, LLC and runs the websites getitfree.us and samples.com.  Tibrio is a
11  Delaware Limited Liability Company conducting business in San Diego,
12  California.  Tibrio entered into a contractual relationship with Cross-Defendant
13  Global Ventu Holding, BV on or around September of 2016 which was terminated
14  in November of 2018.  Tibrio created the advertisements and source material which
15  have been misappropriated by Cross-Defendants.

16       8.    Cross-Defendant Global Ventu Holding, BV ("Global Ventu") is a
17  Dutch corporation, with its principal place of business located in Sint
18  Sebastiaansbrug 13 2611DN, Delft, The Netherlands.  Global Ventu is a target
19  driven advertising agency specializing in lead generation and data acquisition, i.e.,
20  the generation of consumer interest into a business's products or services.
21  Following the termination of the relationship between Tibrio and Global Ventu,
22  Global Ventu used Tibrio's proprietary and confidential information without
23  consent.  This has caused Tibrio financial and reputational harm.

24       9.    Cross-Defendant Alex Andebeek ("Andebeek") is the Chief Executive
25  Officer of Global Ventu and was the main contact between Tibrio and Global
26  Ventu.  Andebeek has used Tibrio's proprietary and confidential information
27  without consent.  This has caused Tibrio financial and reputational harm.
28  ///

3

TIBRIO, LLC'S CROSS-COMPLAINT        19cv1018 DMS LL

1     9.10.  Cross-Defendant Corey Oneal ("Oneal") is a former employee of

2 Tibrio who worked with Global Ventu. Chat records between Andebeek and Oneal

3 show that Oneal breached his employment agreement with Tibrio and likely

4 interfered with Tibrio and Global Ventu's financial relationship.

5 ///

6 **CONSPIRACY ALLEGATIONS**

7     10.11.On information and belief, at all relevant times hereto, Alex Andebeek

8 ("Andebeek") and Global Ventu Holding, BV ("Global Ventu") conspired and

9 planned, one with another, to misappropriate trade secrets from Tibrio, LLC

10 ("Tibrio").  As joint tortfeasors, Andebeek and Global Ventu are both liable for the

11 entire damage done in pursuance of the common design.

12     11.12.Cross-Complainant is ignorant of the true name and capacities,

13 whether individuals or otherwise of Cross-Defendants sued as Roes 1 through 100,

14 inclusive, and therefore sues these Cross-Defendants by such fictitious names.

15 Cross-Complainant will amend this Cross-Complaint to allege their true names and

16 capacities when ascertained.  Cross-Complainant is informed and believes, and

17 thereon alleges, that each of the fictitiously named Cross-Defendants are

18 responsible in some manner for the occurrence alleged, and that Cross-

19 Complainant's injuries herein alleged were proximately caused by such Cross-

20 Defendants.

21 **ALTER EGO AND CONSPIRACY ALLEGATIONS**

22     12.13."Under the alter-ego doctrine, when the corporate form is used to

23 perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or

24 inequitable purpose, the courts will ignore the corporate entity and deem the

25 corporation's acts to be those of the other person or organization actually

26 controlling the corporation, in most instances the equitable owners." *Sonara*

27 *Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 538 (2000).

28

4

TIBRIO, LLC'S CROSS-COMPLAINT           19cv1018 DMS LL

13.14. "In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner and that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the

///

corporation alone." *Sonara Diamond Corp. v. Superior Court,* supra, 83 Cal.App.4th at 538.

14.15. During all relevant times, Andebeek and Roes 1-100, were leaders and executives at Global Ventu Holding, BV ("Global Ventu").

15.16. At all relevant times, Andebeek and Roes 1-100, as officers and shareholders, commanded, influenced, and controlled the affairs of Global Ventu. Andebeek and Roes 1-100 acted outside of any agency relationship afforded by Global Ventu's corporate status and in fact acted in such a way as to completely disregard and ignore any recognized corporate formalities or purpose with regards to Global Ventu's operation.

16.17. At all relevant times, there existed a unity of interest and ownership between Global Ventu, Andebeek, and Roes 1-100 such that the individuality and separateness of Global Ventu, Andebeek, and Roes 1-100 caused to and in fact never did exist.

17.18. Andebeek and Roes 1-100 used Global Ventu as a mere shell and naked framework for their own benefit. In this regard, Andebeek and Roes 1-100 used Global Ventu as a conduit to conduct his/her personal business, property, and affairs and as a device to avoid individual liability.

18.19. Upon information and belief, Andebeek, Global Ventu, and Roes 1-100 conspired and planned, one with another, to defraud Cross-Complainant by employing Tibrio's proprietary and confidential information.

5

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

1   19.20.Andebeek, Global Ventu, and Roes 1-100 were members of this
2   conspiracy from the inception.  As active participants in the conspiracy, Andebeek,
3   Roes 1-100, and Global Ventu are joint tortfeasors liable for the entire damage done
4   in pursuance of the common design.

5                          **VENUE**

6   20.21.This Court has jurisdiction over this matter and personal jurisdiction
7   over Plaintiff and Cross-Defendant as Global Ventu Holding, BV and Alex
8   Andebeek have already initiated litigation in this Court and availed itself of the
9   rights and privileges of this venue. This Court also has subject matter and personal
10  jurisdiction over Cross-Defendant Corey Oneal pursuant to 28 U.S.C § 1367.

11                     **STATEMENT OF FACTS**

12  21.22.Tibrio, LLC fka as Samples.com ("Tibrio") owns and operates two
13  websites: samples.com and getitfree.us.  Both sites aggregate free samples ranging
14  from cleaning supplies to snack foods and give them away to customers who visit
15  the websites.  There is also a sweepstakes aspect to Tibrio's getitfree.us website
16  whereby in exchange for answering certain questions, a consumer will be placed
17  into a drawing.

18  22.23.Tibrio generates revenue from those websites by, (1) connecting
19  consumers to advertisers, and (2) allowing advertisers to put ads on the websites.
20  In order to command the highest price possible, Tibrio has spent years developing
21  the details of samples.com and getitfree.us which attract visitors and encourage
22  them to click on advertisements or connect with a relevant advertiser.

23  23.24.One specific method of attracting consumers to the websites is through
24  Facebook advertising and marketing.  This includes creating a specific
25  advertisement, locating the proper consumer demographic, paying Facebook to post
26  the advertisement, and tracking of the consumers who click the advertisement.

27

28

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

24.25. There are specific companies who specialize in Facebook advertising, including Cross-Defendant, Global Ventu Holding, BV run by Alex Andebeek ("Global Ventu" and "Andebeek").

26.    On or around September 12, 2016, Tibrio entered into a Publisher Services Agreement with Global Ventu.

25.    ///

Formatted: Normal, No bullets or numbering
Formatted: Font: 14 pt

26.27. According to this Publisher Services Agreement, Tibrio agreed to create applicable advertisements to be posted on Tibrio's Facebook page which Global Ventu would then monetize.

27.28. Global Ventu agreed that it will "only distribute Advertising Material internally and shall not distribute or re-sell Advertising Material to any external third party without Advertiser's written consent." Global Ventu also agreed that it would not "copy, reproduce or create derivative works of the Advertising Material for any purpose outside of [the] Agreement."

28.29. Further, Global Ventu agreed that it will not "use Affiliates or Sub-Affiliates without Advertiser's prior written consent." This would include such affiliates like Fluent, whom Tibrio was creating ads for during the time Global Ventu was working with Tibrio.

29.30. On September 17, 2016, Tibrio and Global Ventu entered into a separate Revenue Share Agreement.

30.31. Pursuant to the Revenue Share Agreement, Global Ventu agreed to be responsible for general oversight and management of Tibrio's Facebook account "which includes, but is not limited to: (1) developing and optimizing existing campaigns; (2) managing budgets for campaigns; and (3) planning, buying, and executing campaigns."

31.32. This Revenue Share Agreement specified that "should either [Tibrio] or Global Ventu create any advertisements, creatives, copy, or any other related

7

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

intellectual property, the new creations will remain the property of the party which created such intellectual property."

~~32.~~33. Finally, the Revenue Share Agreement's "Confidential Information" provision provides that the parties will not "for any reason or under any circumstance at any time, directly or indirectly use, convert, apply, appropriate, employ, alter, transform, assign, put into operation, or otherwise use any Confidential Information, in whole or in part, for any purpose whatsoever."

~~33.~~34. Over the next two years, Global Ventu and Tibrio had a good working relationship and were making good money together.

~~34.~~35. In November of 2018, Tibrio was preparing to move its backend technology to a platform called ZAN, which was developed by Tibrio's parent company, ZeetoGroup, LLC.  As with any launch of a new product, it was expected that there would be a slight downturn in revenue until all of the issues were worked out.

36. Unfortunately, instead of looking into the future and continuing the lucrative relationship, Global Ventu took this move to ZAN as an opportunity to try and extort more money out of Tibrio.  Following some negotiations, Global Ventu refused to continue the relationship.  Global Ventu then sued Tibrio and its parent company for this separation.

37. Following that separation, it was discovered that Corey Oneal ("Oneal"), a former employee of Tibrio, maintained contact with Andebeek. Throughout these communications, Oneal seems to support the separation and discloses confidential information including, but not limited to, ZAN testing/implementation, negotiation strategies, and testing results.

38. Oneal entered into a Proprietary Information and Inventions Assignment Agreement ("Confidentiality Agreeement") on August 15, 2018. A true and correct copy of the Confidentiality Agreement is attached hereto as "Exhibit 1—." Pursuant to section two of the Confidentiality Agreement, Oneal, during and

8

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

1  after his employment with Tibrio, had a duty to keep confidential things such as

2  business practices and testing results. *Id.* at § 2. Further, Oneal had a duty not to

3  make derogatory statements. *Id.* at § 5. The Confidentiality Agreement was

4  breached by Oneal through his communications with Andebeek.

5  35.39.The chats between Oneal and Andebeek also show that Oneal

6  interfered with Global Ventu and Tibrio working together again after ZAN

7  stabilized. During the termination correspondence, Andebeek stated that he would

8  be willing to work with Tibrio again in the future and that it was not an easy

9  decision to pause all traffic. Unfortunately, following those representations, Oneal

10  told Andebeek that the entire ZAN platform was not doing well and that Tibrio was

11  failing and terminating employees. To top off his plan, Oneal solicited Global

12  Ventu personally to work together in the future. Cross-Complainants believe that

13  had Oneal not acted the way he did, this lawsuit may have been avoided and the

14  parties would likely be working together today.

15  36.40.After months of litigation, one of Tibrio's employees, while on

16  Facebook, ran into a Facebook page called "Get Free Samples" which is eerily

17  similar to Tibrio's "Get it Free" Facebook page.  Upon further inspection, it was

18  discovered that this page was using the Tibrio brand and assets without permission.

19  This includes, (1) the Facebook page cover photo, (2) Facebook page story copy,

20  and (3) product images.  This site is being run by Global Ventu and is neither

21  owned nor operated by either ZeetoGroup, LLC or Tibrio.

22  37.41.This kind of misappropriation not only diverts traffic away from

23  Tibrio, but also negatively impacts Cross-Complainant's business by association.

24  38.42.Global Ventu has been using Tibrio's property to improperly solicit

25  clients away from Tibrio.  This has caused Tibrio financial and reputational harm.

26  **CAUSES OF ACTION**

27  **FIRST CAUSE OF ACTION**

28

9

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

**MISAPPROPRIATION OF TRADE SECRETS- CALIFORNIA CIVIL CODE SECTION 3426.1**

**(CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND ROES 1-100)**

~~39.~~43. Cross-Complainant re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

~~40.~~44. Cross-Complainant owns the proprietary and confidential information which qualifies as trade secrets ("Trade Secrets"). This includes advertisements and content. These Trade Secrets provide a commercial advantage as defined by California Civil Code section 3426.1(d).

~~41.~~45. At the time of their misappropriation, the Trade Secrets were not authorized to be used by anyone outside of Tibrio.

~~42.~~46. Cross-Defendants have improperly used the Trade Secrets in order to harm Tibrio.

~~43.~~47. The improper means used by Cross-Defendants was a direct breach of the agreements entered into between the parties.

~~44.~~48. Cross-Defendants were aware that they had misappropriated the trade secrets of Tibrio by improper means.

~~45.~~49. Cross-Defendants' acquisition was a substantial factor in causing Tibrio's harm and Cross-Defendants were unjustly enriched.

~~46.~~50. The actions of Cross-Defendants qualify as willful and malicious misappropriation and therefore, the Court should award exemplary damages as provided by California Civil Code section 3426.3(c).

**SECOND CAUSE OF ACTION**

**MISAPPROPRIATION OF TRADE SECRETS- 18 U.S.C.S SECTION 1832 ET AL.**

**(CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND ROES 1-100)**

10

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

47.51. Cross-Complainant re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

48.52. Cross-Complainant owns and possesses certain confidential and trade secret information as alleged above.

49.53. Cross-Complainant's Trade Secrets relate to products and services used, sold, shipped, and/or ordered in, interstate or foreign commerce.

50.54. Cross-Complaint has taken reasonable measures to keep such information secret and confidential.

51.55. Cross-Complainant's confidential Trade Secret information derives independent value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

52.56. Cross-Defendants have misappropriated Tibrio's Trade Secrets in the improper and unlawful manner as alleged herein.

53.57. Cross-Defendants' wrongful conduct in misappropriating Tibrio's Trade Secret, unless and until enjoined and restrained by order of this Court, will cause great and irreparable harm to Tibrio.

54.58. Tibrio is threatened with losing the value of its advertisements along with current and potential business with top advertisers. Tibrio will continue to suffer irreparable injury that cannot be adequately remedied at law unless Cross-Defendants are enjoined from engaging in any further acts of misappropriation.

55.59. Each of the acts of misappropriation were done willfully and maliciously by Cross-Defendants with the deliberate intent to injure Tibrio's business and improve their own for financial gain. This entitles Tibrio to exemplary damages and/or attorneys' fees to be proven at trial.

### THIRD CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

11

1    **(CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND**

2    **ROES 1-100)**

3    ~~56.~~60. Cross-Complainant re-alleges and incorporates all of the above

4    paragraphs as though fully set forth herein.

5    ~~57.~~61. Cross-Defendants intentionally interfered with the economic

6    relationships between Tibrio and Fluent, which probably would have resulted in an

7    economic benefit to Cross-Complainant.

8    / / /

9    ~~58.~~62. Cross-Defendants knew of Cross-Complainant's relationship with

10    Fluent, and intentionally acted in any way which disrupted the relationship.

11    ~~59.~~63. Due to Cross-Defendants' act, Cross-Complainant's relationship with

12    Fluent was actually disrupted.

13    ~~60.~~64. As a result, Cross-Complainant suffered economic harm, and Cross-

14    Defendant's conduct was a substantial factor in causing such harm.

15    **FOURTH CAUSE OF ACTION**

16    **UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES**

17    **PURSUANT TO CALIFORNIA BUSINESS AND PROFESSIONS CODE**

18    **SECTION 17200**

19    **(CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND**

20    **ROES 1-100)**

21    ~~61.~~65. Cross-Complainant re-alleges and incorporates all of the above

22    paragraphs as though fully set forth herein.

23    ~~62.~~66. California Business and Professions Code section 17200 prohibits

24    unlawful, unfair, or fraudulent business acts.

25    ~~63.~~67. On Cross-Defendants' Facebook page called "Get Free Samples,"

26    Cross-Defendants used advertisements, imagery, and content that are identical or

27    nearly identical as those on Cross-Complainant's Facebook page "Get it Free."

28

12

1    64.68. Cross-Defendants' actions are fraudulent as the public is likely to be

2  deceived by Cross-Defendants' intentional replication of Cross-Complainant's

3  Facebook page.

4    65.69. Cross-Defendants' actions are unfair because they are unjustly

5  benefitting and taking advantage of Cross-Complainant's work, which harms

6  Cross-Complainant's reputation and competitiveness.

7    66.70. Due to the practices of Cross-Defendants, Tibrio has suffered material

8  damages in an amount to be proven at trial.

9  / / /

10                        **FIFTH CAUSE OF ACTION**

11                        **BREACH OF CONTRACT**

12        **(CROSS-COMPLAINANT AGAINST ALL CROSS-DEFENDANTS AND**

13                        **ROES 1-100)**

14    67.71. Cross-Complainant re-alleges and incorporates all of the above

15  paragraphs as though fully set forth herein.

16    68.72. The Publisher Service Agreement and Revenue Share Agreements

17  entered into between the parties required Cross-Defendants to refrain from using

18  the Trade Secrets for any other reason than that described by the agreements i.e.,

19  running campaigns for Tibrio through Facebook.

20    69.73. Cross-Defendants breached this agreement by using the Trade Secrets

21  on a site designed to look like Tibrio's without Tibrio's consent.  Tibrio complied

22  with all obligations under the agreement.

23    74.   This clear breach of duties set forth in the contract have caused Tibrio

24  damages.

25    75.   On August 15, 2018, Corey Oneal ("Oneal") entered into a Proprietary

26  Information and Inventions Agreement ("Confidentiality Agreement") with Tibrio.

27  See Exhibit 1——. The terms of the Confidentiality Agreement required Oneal to

28  keep confidential certain things such as business practices, negotiation strategies,

                                  13

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

63

1   results from testing, sales, revenue, and accounting information. Exhibit 1——, § 2.

2   Further, Oneal also had an obligation not to make derogatory statements regarding

3   Tibrio.

4       76.    In the chats produced by Cross-Defendants, Oneal, following Global

5   Ventu's termination of the relationship, (1) tells Andebeek that things are "bad" at

6   Tibrio; (2) discloses information regarding employee terminations; (3) praises

7   Andebeek's decision to terminate the parties' relationship; (4) discusses

8   performance of Zeeto's proprietary platform, ZAN, during testing and; (5) discloses

9   the negotiations strategy used by Stephan Goss, Tibrio's CEO, with Global Ventu.

10  These comments constitute breaches of the Confidentiality Agreement.

11      ——Tibrio complied with all obligations under the Confidentiality

12  Agreement and Oneals breach has caused damages to Plaintiffs.

13      77.

14          **SIXTH CAUSE OF ACTION**

15  **INTERFERRENCE WITH PROSPECTIVE BUSINESS ADVANTAGES**

16  **(CROSS-COMPLAINANT AGAINST COREY ONEAL AND ROES 1-100)**

17      78.    Cross-Complainant re-alleges and incorporates all of the above

18  paragraphs as though fully set forth herein.

19      79.    Global Ventu and Tibrio have had a financial relationship and

20  following the termination, there was the possibility of future economic benefit.

21  Oneal had knowledge of this relationship.

22      80.    According to the initial disclosures produced by Plaintiff, on

23  November 17, 2018, Andebeek, during termination discussions, told Tibrio that "if

24  performance comes back up and you'd like us to start back up then just let me

25  know." However, following the termination and Oneal leaving Zeeto, Oneal made

26  comments to Andebeek such as "[Zeeto] never invested time to understand why the

27  old system outperformed… that is what I was trying to do when I got pulled away

28

14

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL



1   to complete the shitty migration plan they put forward." Mr. O'Neal also told

2   Andebeek that his decision to pause "turned out to be spot on."

3       81.    Following Andebeek's statement regarding Global Ventu's willingness

4   to work together in the future, and Oneal's disparaging comments in response,

5   Oneal personally solicited Andebeek by writing that he "might have some

6   opportunity for [Global Ventu] and I am entertaining a consulting gig I might want

7   to get your advice on."

8       82.    Oneal persuaded Global Ventu not to wait for the ZAN platform to

9   find its footing and instead convinced Andebeek to work with Oneal elsewhere.

10  Oneal knew of the economic relationship along with the possibility for

11  a future relationship and acted intentionally to disrupt that relationship. This

12  resulted in a lawsuit against Zeeto and Tibrio and likely deprived all parties of

13  revenue they would have received working together now that ZAN has been

14  performing.

15  70.83.

**Formatted:** Font: 14 pt

16  ### REQUEST FOR JURY

17      1.    Cross-Complainant hereby requests a jury trial in this action.

18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

15

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL

1

### **PRAYER FOR RELIEF**

2   1.    Damages in an amount to be proven at trial;

3   2.    For reasonable attorney's fees;

4   3.    For a preliminary injunction/temporary restraining order;

5   4.    For exemplary damages;

6   5.    For pre-judgment and post-judgment interest, according to proof;

7   6.    For costs of suit incurred herein; and,

8   7.    For such other and further relief as this Court deems just and proper.

9

10                          **MORRIS LAW FIRM, APC**

11

12  Dated:  April 17, 2020 ~~April 14, 2020~~                    ~~s/ Jacob A. Gillick~~

13
                              Jacob A. Gillick, Esq.
14                            jgillick@morrislawfirmapc.com
                              Attorneys for Defendants Zeetogroup, LLC,
15                            Samples.com, LLC, and Tibrio, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

                                   16

TIBRIO, LLC'S CROSS-COMPLAINT                    19cv1018 DMS LL